[No. A095534. First Dist., Div. Four. May 23, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ELIGIO ORTIZ, Defendant and Appellant.

COUNSEL

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Bruce Ortega and René A. Chacón, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SEPULVEDA, J.**—On the morning of September 29, 2000, Anthony Pilton, his wife, Nicole, and their two sons—Adam and Steven—were traveling south on Highway 29, near Napa, in their rented Ford Taurus. The Pilton family was visiting California from their home in New Zealand. Anthony drove, Nicole occupied the front passenger's seat, and the boys sat together in the back. About a fifth of a mile south of the entrance to Bothe State Park, the Piltons' car was struck by a 1972 Ford flatbed truck that, traveling at high speed, had crossed the double-yellow center line dividing the highway and crashed head-on into them. Defendant owned and was at the wheel of the Ford truck. Anthony and Adam Pilton were killed outright in the collision; Nicole and Steven were injured, both seriously.

In the ensuing accident investigation, California Highway Patrol officers determined defendant's truck was mechanically sound at the time of the collision and capable of reaching speeds in excess of 100 miles an hour. Defendant, the investigating officers determined, was about 350 feet from

the collision site when he pulled out to pass a Toyota 4-Runner, crossing a double-yellow line. He had a full view of oncoming traffic when he attempted to pass the Toyota, and was traveling at approximately 65 miles an hour. Given the road terrain and highway visibility, a prosecution expert testified, defendant's driving was "extremely dangerous."

Others who had witnessed the collision testified at defendant's trial for second degree murder. Gregory Remesal, traveling northbound on Highway 29 that morning, saw a white Ford truck stop in the southbound lane, execute a U-turn and accelerate quickly into the northbound lane. Traveling at an estimated speed of 55 miles an hour, the driver, according to Remesal, drove very close to the rear of a small car and then "slam[med] on the brakes." Following the truck, Remesal observed it tailgating the car in front "aggressively," driving as if to overtake it but unable to do so because of oncoming traffic. The driver of the white truck was "very reckless," according to Remesal, and "extremely dangerous." Remesal estimated the truck's speed as at least 80 miles an hour when it overtook the small car. As he rounded a curve in the highway, Remesal saw the collision scene. He also saw defendant leaving his truck and then begin running to the road shoulder.

About the same time, Christina Palma and her passenger, Karen Campbell, were proceeding north on Highway 29 in Palma's 1987 Mazda station wagon. Palma noticed a white Ford truck close behind her. Frightened, she accelerated to put some distance between them. Three times the truck attempted to overtake her, dropping back each time because of oncoming traffic in the southbound lane. Eventually, crossing a double-yellow line, the Ford truck passed Ms. Palma's car, "flying around those curves." Ms. Campbell, Ms Palma's passenger, testified she saw the white truck pull off the side of the road, execute a U-turn and pull quickly in behind Palma's car, cutting off a white van. She observed dust flying behind the truck's tires and characterized the driver as "fast and irresponsible," as well as reckless and dangerous. Defendant pulled to within "a foot" of Ms. Palma's vehicle, frightening both women. As defendant's truck passed them, Ms. Campbell testified, it was traveling somewhere between 50 and 80 miles an hour, close to the center line.

Jane and Charles Mack were riding in their green Toyota 4-Runner that morning when they were passed "very dangerously" over a double-yellow center line by a compact silver or blue automobile. The occupants of that car, Ms. Mack testified, a woman and two men, were laughing. At that point, a white truck "came right up on [her] tail," traveling at about 50 miles an hour and very close to the center line, "looking as if it wanted to pass . . . ." As the white truck accelerated around her vehicle, crossing the

double-yellow center line, Mack saw the green Taurus some 20 feet north of her, its driver's face wearing an expression of "absolute terror." Ms. Mack watched as the truck and the green Taurus collided in the southbound lane. From the first time she saw the Taurus, she said, the white truck made no attempt to pull back into the northbound land; she thought he could have successfully taken evasive action but the driver "just kept giving it more gas."

George Basuto, 17 years old at the time of trial, was a passenger in a car driven by Deborah Ortiz—his cousin and defendant's estranged wife—that morning. As they proceeded north, he heard Deborah say they had just passed her husband's truck, heading south. Deborah accelerated from 50 to 60 miles an hour. As Basuto looked back, he saw defendant behind them, traveling about 70 miles an hour and attempting to pass an SUV (sport utility vehicle). He did not see the Taurus until it collided with defendant's truck as he tried to swerve back into the right lane. When defendant tried to overtake the SUV, Basuto testified, he made no attempt to pull back in the northbound lane.

Jesus Robledo, also a passenger in Deborah Ortiz's car, remembered turning around to look back and seeing a truck that had been traveling south, slam on its brakes and make a U-turn. He told police at the accident scene that the white truck was passing other vehicles at "at least 80, 85." He thought the truck's passing was unsafe, crossing double-yellow lines and going over into oncoming traffic. Deborah Ortiz testified her husband was following her car in his truck and that she witnessed the collision with the Piltons. She observed defendant's truck cross the double-yellow center line and considered his driving dangerous.

Highway Patrol Officer Jeff Dunlap was present at the hospital when defendant was admitted and his injuries treated. It was stipulated that at the time Dunlap examined him, defendant was not under the influence of alcohol or any controlled substance. Gerald Rico, a Highway Patrol officer, was also present at the hospital. He heard defendant talking on the telephone from his bed. Speaking in English, defendant told someone on the telephone that he was going to jail, that he killed some people, had been driving about 100 miles an hour, and had slowed down to about 60 or 70 miles an hour because of a slower car in front of him.

At trial, evidence of prior traffic incidents involving defendant also was introduced by the prosecution. On November 11, 1989, defendant was arrested in St. Helena for driving under the influence of alcohol after having registered a .20 percent and .19 percent blood-alcohol level; police officers had observed his car drifting over both the center line and shoulder of the

road. He was convicted of the offense in 1991. Mike Elias testified that on October 25, 1990, he was driving a truck through a green light at an intersection in Long Beach when a vehicle, with defendant at the wheel, entered the intersection and collided with his car. Officer Michael Hillhouse of the Los Angeles Police Department testified that on October 25, 1990, he responded to a traffic accident involving a Buick LeSabre driven by defendant and a pickup truck driven by Elias. Defendant smelled of alcohol, Hillhouse testified, and appeared intoxicated. He was arrested for driving under the influence of alcohol and was later convicted of that offense.

Robert Vandermeer testified that on March 6, 1991, he was working as a plainclothes police officer for the City of Long Beach when he was required to swerve to avoid a collision with a white Volkswagen. Following the vehicle, Vandermeer radioed for assistance. When the Volkswagen was pulled over, Vandermeer believed the driver—defendant—was drunk and arrested him. A custodian of records for the Long Beach Police Department testified that on March 6, 1991, defendant was arrested and subsequently convicted for driving with a blood-alcohol level above .08 percent. Anthony Farrar, a California Highway Patrol officer, testified that in 1993, he issued a traffic citation to defendant.

Nancy Merha testified that on April 12, 2000, she heard the screeching of tires and saw defendant driving a yellow Camaro in a fast, dangerous, and reckless manner. Christopher Hartley, a police officer, testified that around 8:00 a.m. on April 12, 2000, he responded to Ms. Merha's phone call about a yellow Camaro. When he questioned defendant about his driving, defendant did not appear to appreciate the danger of his behavior.

Ryan Aimer testified that on June 14, 2000, he and defendant were driving their vehicles to a jobsite, with Aimer in front and defendant following. At one point, Aimer testified, defendant crossed over the double-yellow center line, into the opposite lane, and passed Aimer's vehicle. There were no cars in the opposite lane "for a great distance," but had there been, Aimer testified, defendant's driving could have been dangerous. Juan Hernandez testified that he had worked with defendant as part of a program in which drivers convicted of driving under the influence of alcohol receive counseling. Defendant began the program in May 1998 and completed it in February 2000.

After receiving instructions from the trial court, the jury retired to deliberate and returned with a verdict of guilty. This appeal is timely.

## ANALYSIS

The legal principles underlying the only real issue before us in this appeal from a conviction for "vehicular murder" are settled and familiar. At

least since 1981, when our Supreme Court affirmed a conviction of second degree murder arising out of a high speed, head-on automobile collision by a drunken driver that left two dead, California has followed the rule in vehicular homicide cases that "when the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied . . . ." (*People v. Watson* (1981) 30 Cal.3d 290, 298 [179 Cal.Rptr. 43, 637 P.2d 279].) In such circumstances, "a murder charge is appropriate." (*Ibid.*) So-called implied malice second degree murder, the *Watson* court explained, is committed "when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " . . . .' [Citations.] Phrased in a different way, malice may be implied when [a] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Id.* at p. 300.) "[A] finding of implied malice," Justice Richardson went on to write for the majority, "depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard."[1] (*Watson*, at pp. 296-297.)

I

In this prosecution, the People sought to meet their burden of establishing that defendant possessed the requisite implied malice mental state at the time of the collision with the Piltons' car by two evidential means: First, by offering evidence of defendant's conduct on the day of the fatal collision; second, by presenting evidence of his *prior* conduct in assertedly analogous circumstances. It is this latter evidence—so-called "uncharged misconduct" or "uncharged bad acts" evidence—and its admissibility that chiefly concerns us here.[2] The challenged evidence consisted of documentary and oral testimony concerning seven past incidents in which defendant had either been convicted of reckless driving, convicted of reckless drunk driving, or been observed driving recklessly, and his participation in a mandatory educational program (known as the SB-38 program[3]) on the dangers of drinking and driving.

▮ It is the evidence of the alcohol-related prior traffic incidents that is the focal point of defendant's attack on his conviction of vehicular murder in

---

[1]For a scholarly account of the historically cyclical nature of vehicular murder prosecutions in the United States, see Luria, *Death on the Highway: Reckless Driving as Murder* (1988) 67 Or. L.Rev. 799.

[2]See, e.g., Imwinkelried, Uncharged Misconduct Evidence (1998) (hereafter Imwinkelreid).

[3]The name is derived from Senate Bill No. 38, amended August 11, 1977, approved by the Governor, September 16, 1977 (1977-1978 Reg. Sess.), legislation requiring multiple drunk-driving offenders to attend counseling sessions on the dangers associated with drinking and driving.

this court. In a nutshell, he presents two contentions. First, the evidence of his prior convictions for drunk driving (including attendance at the SB-38 program) lacked any relevance to the issues raised by his prosecution and was thus inadmissible as a matter of law, it having been conceded by the People that the collision with the Piltons' automobile did not involve the use of alcohol or other intoxicants. Second, even if the prior drinking-related misconduct had been relevant, its prejudicial impact on the jury far outweighed its probative value and should have been excluded by the trial court under the provisions of Evidence Code section 352.[4]

It has long been the rule, of course, that evidence of uncharged misconduct is inadmissible to establish a defendant's *propensity* to commit the offense charged. The bar on the use of such "propensity evidence" is not that it lacks relevance. Rather, it is the concern that such evidence may be regarded by the trier of fact as *too* relevant, "provoking," as Wigmore has it, "an overstrong tendency to believe defendant guilty" based on the commission of the *prior* acts rather than those charged in the pending prosecution. In short, the evidence is barred to prevent conviction based upon the defendant's "bad character." (1A Wigmore on Evidence (Tillers rev. 1983) § 194, at p. 1859; see also Imwinkelreid, *supra*, §§ 1:01-1:03.) California's Evidence Code codifies this bar in section 1101, subdivision (a) (section 1101(a)). That provision makes flatly inadmissible "evidence of a person's character or a trait of his . . . character . . . when offered to prove . . . conduct on a specified occasion." (§ 1101(a); see generally Simons, California Evidence (1998) §§ 6.01-6.24, pp. 6-4-6-33.)

The *exceptions* to the bar on the admissibility of such evidence of uncharged acts are equally well established. Codified as subdivision (b) of section 1101 (section 1101(b)), the rule has long been that evidence of uncharged misconduct *is* admissible where relevant to prove "some fact (such as motive, opportunity, intent, preparation, plan, *knowledge*, identity, absence of mistake or accident . . .) other than [a defendant's] disposition to commit such an act." (§ 1101(b), italics added.) We emphasize the word "knowledge" in the foregoing statutory enumeration because, in seeking admission of the uncharged misconduct evidence at defendant's trial, it was the prosecution's contention that the evidence was relevant because it tended to establish a subjective awareness on the part of defendant of the disastrous consequences that can follow in the wake of recklessly operating a motor vehicle on a public highway. As tending to establish, in other words, defendant's *knowledge*—gained in the course of the prior misconduct—of the natural consequences, dangerous to life, of the reckless operation of a motor vehicle, and of his persistence in that behavior, thus evidencing a

---

[4]All further section references are to the Evidence Code unless otherwise indicated.

conscious disregard for the lives of others on the road. These mental features, of course, comprise the mens rea of implied malice, thereby supporting an accusation of second degree murder.

In urging us to overturn his murder conviction, defendant argues the trial court erred reversibly in admitting the uncharged misconduct evidence dealing with his convictions for driving under the influence of alcohol and his attendance at the SB-38 program. The ground for the argument is the obvious one: Prior to trial, the People stipulated there was no evidence indicating defendant had consumed alcohol or any other intoxicant on the day of the collision with the Piltons' Taurus. Defendant argues that because the charges at his trial did not involve the use of alcohol, the prior misconduct evidence of repeated drunk-driving incidents lacked any relevance whatever to the pending criminal charges. Worse, that evidence was manifestly prejudicial, given its tendency to portray defendant as a problem drinker and a menace on the highway because of his propensity for driving while intoxicated. The challenged prior drunk-driving evidence thus served as nothing more than a form of prohibited propensity evidence of defendant's "bad character," the very vice supporting the bar imposed by section 1101(a).

On these facts, the issue is an intriguing one. Our review of relevant law and the appellate record persuades us that the trial court did not abuse its discretion in admitting the challenged uncharged misconduct evidence relating to defendant's prior drunk-driving arrests at his trial. As we explain, since *People v. Watson, supra,* 30 Cal.3d 290, more than half a dozen published opinions of the Court of Appeal have affirmed convictions of second degree vehicular murder. In each of these cases, the trial court's admission of uncharged misconduct evidence to show the requisite mental state supporting a finding of implied malice was upheld on appeal.

The bulk of these cases involved the use of alcohol or other intoxicants in *both* the uncharged misconduct *and* the prosecution in which it was sought to be admitted. The resulting case law makes it clear, however, that the contours of the "knowledge" exception to the bar imposed by section 1101(a) are not so restricted that the evidence at issue here was admitted erroneously by the trial court. In short, courts have recognized repeatedly that a motor vehicle driver's previous encounters with the consequences of recklessness on the highway—whether provoked by the use of alcohol, of another intoxicant, by rage, or some other motivator—sensitizes him to the dangerousness of such life-threatening conduct. This is so because apprehensions for drunk driving, and the citations, arrests, stiff fines, compulsory attendance at educational programs, and other consequences do not take

place in a vacuum. A review of the relevant case law brings home the ground for this conclusion.

In *People v. Watson, supra,* 30 Cal.3d 290 itself—a drunk-driving vehicular murder prosecution—the high court, discussing the sufficiency of the trial evidence to sustain the jury's finding of implied malice supporting its murder verdict, wrote that the defendant "had driven his car to the establishment where he had been drinking, and *he must have known that he would have to drive it later.*" (*Id.* at p. 300, italics added; see also *People v. Albright* (1985) 173 Cal.App.3d 883 [219 Cal.Rptr. 334] [same].) In other words, the requisite mental state at the time of the prior incident—one supporting a subsequent finding of an awareness of the dangers of recklessness—was not formed while inebriated so much as before and after the resulting traffic incident. Whether provoked by alcohol, other intoxicants, or road rage, such incidents typically include a host of costly and inconvenient consequences. From this uncharged misconduct evidence, through a series of inferences, a jury could conclude that, at the time of the *charged* misconduct, the defendant possessed a "wanton disregard for life, and . . . a subjective awareness of the risk created," from which "malice may be implied . . . ." (*People v. Watson, supra,* 30 Cal.3d at p. 298.)

The case of *People v. Brogna* (1988) 202 Cal.App.3d 700 [248 Cal.Rptr. 761], illustrates the point. There, the court, in rejecting a claim the defendant perceived little from the experience of being arrested for drunk driving and being required to attend educational classes, pointed out that such an argument "ignores the fact that the conviction itself *does not occur in a vacuum. The convicted offender is subject to a wide array of criminal and civil disabilities, all of which serve to underscore the dangers* of driving under the influence." (*Id.* at p. 709, italics added.) And in *People v. Ricardi* (1990) 221 Cal.App.3d 249 [270 Cal.Rptr. 425], the court pointed out that by the time the defendant had completed alcohol rehabilitation programs and participated in counseling "he was *aware of the dangers* of drinking and driving . . . ." (*Id.* at p. 254, italics added.)

In *People v. McCarnes* (1986) 179 Cal.App.3d 525 [224 Cal.Rptr. 846], the defendant contended on appeal that his prior drunk-driving convictions, admitted at trial, showed "only that he knew such driving was *unlawful,* but not that he knew it was *dangerous.*" Forcefully rejecting the argument, the court wrote "the reason that driving under the influence is unlawful is *because* it is dangerous . . . . [¶] Moreover, included in . . . defendant's [prior] convictions . . . was the sentence that he enroll in and complete a drinking driver's education program. Even if we assume defendant did not realize after his *convictions* that it was dangerous to drink alcohol and drive,

surely realization would have eventually arrived from his *repeated* exposure to the driver's educational program. To argue otherwise is little short of outrageous." (*Id.* at p. 532, italics in original.)

In *People v. Murray* (1990) 225 Cal.App.3d 734 [275 Cal.Rptr. 498], the defendant claimed it did " 'not necessarily follow that someone who sits through a mandatory [educational] course has attained a subjective awareness' of the course material." (*Id.* at p. 745.) Rejecting the argument, the court wrote that, as in "*McCarnes . . .* appellant had repeated experiences of drunk driving convictions and repeated exposures to mandatory educational programs, from which the jury could infer that appellant became *aware* that drunk driving is dangerous to life . . . . [¶] On the fateful day . . . appellant deliberately chose to drive his truck to work so he could attend the drinking party . . . . He deliberately chose to drink and drive, *knowing* that after the party he would have to drive a long distance home . . . . This is like *Watson . . .* where the defendant drove his car to a bar and 'must have *known* that he would have to drive it later.' " (*Id.* at p. 746, italics added.)

In *People v. Eagles* (1982) 133 Cal.App.3d 330 [183 Cal.Rptr. 784]—a vehicular murder prosecution that did *not* involve the use of alcohol or other intoxicants—the appellate panel rejected a claim of error in admitting evidence of prior reckless driving to show implied malice with these words: "Here, the evidence of prior driving conduct was offered to prove an intermediate fact (*knowledge* that conduct is life threatening) necessary to the establishment of the ultimate fact of implied malice . . . . [¶] Evidence of excessive speed resulting in a near collision is relevant to *knowledge of risk*, 'an actual awareness of the great risk of harm' of excessive speed . . . . We agree with the prosecutor at trial that it is a permissible inference that '[w]hen you're driving around . . . at a high rate of speed, almost cause an accident, you must *see* what the risk of harm is that can follow it.' What defendant *knew* in the afternoon he undoubtedly *knew* that night before the fatal accident. The evidence was admissible to prove implied malice." (*Id.* at p. 340, italics added.)

Courts have reached the same result in two published opinions affirming vehicular murder convictions in collisions and deaths involving the defendant drivers' use of phencyclidine (PCP), rather than alcohol. In *People v. Olivas* (1985) 172 Cal.App.3d 984 [218 Cal.Rptr. 567], a First District Court of Appeal panel, rejecting the defendant's claim that a preaccident collision was a mere " 'fender bender,' " insufficient to support a finding of implied malice, wrote that "the preaccident collision may have been minor, but it was certainly sufficient to *apprise* Olivas of the risk he was creating . . . ." (*Id.* at p. 988, italics added.) To like effect is *People v. David* (1991) 230

Cal.App.3d 1109 [281 Cal.Rptr. 656], another case involving the use of PCP. There, the defendant contended on appeal from his conviction that the requisites of *Watson* were not met by the evidence at his trial. Echoing *Watson*, however, the court wrote that the defendant "drove *knowing* that he was under the influence of PCP. Appellant's own testimony . . . showed that [he] felt the effects of PCP immediately . . . . In light of appellant's prior experience with PCP, he must have *realized* he was under the influence . . . . [¶] . . . Prior convictions and exposure to mandatory educational programs are admissible to show the accused's *awareness of the life threatening risks* of driving under the influence." (*Id.* at pp. 1114-1115, italics added.)

All but one of the foregoing cases (*People v. Eagles, supra,* 133 Cal.App.3d 330) involved the use of intoxicants by the accused in both the charged conduct resulting in homicide and the prior bad acts admitted at trial to establish the existence of implied malice. In *People v. Contreras* (1994) 26 Cal.App.4th 944 [31 Cal.Rptr.2d 757], however, the defendant was convicted of vehicular second degree murder arising out of a rear-end collision in which a child was killed. On the ensuing appeal, he contended the conviction could not stand because the collision involved neither excessive speed nor drug or alcohol use, requisites for a murder conviction under *Watson,* he asserted. Pronouncing his claim "meritless," Justice Klein wrote that "the absence of intoxication or high speed flight from pursuing officers does not preclude a finding of malice. These facts merely are circumstances to be considered in evaluating culpability. Where other evidence shows 'a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied . . . .' " (*Id.* at p. 955.) Based on the case law, the court concluded, "it is clear [the defendant] properly may be charged with murder in this case even though he was sober and was not involved in a high-speed chase with police at the time of the fatal collision." (*Ibid.*)

Psychologically speaking, the insights of the courts in these cases seem little more than commonplace, intuitively familiar to most. A jury is entitled to infer that regardless of the mental state or condition that accompanies an instance of reckless driving—whether intoxication, rage, or wilful irresponsibility—the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior. The lesson in these many cases was not lost on the trial court when it ruled on the prosecution's motion seeking admission of the uncharged misconduct evidence. After briefing and oral argument, Judge Kroyer delivered his ruling orally from the bench. "Every time the defendant drove badly before he allegedly committed these two murders," the trial judge explained, "and every time he was convicted or arrested

or punished in some fashion, *his awareness of the dangers of driving badly increased* and that is what the district attorney has a legitimate right to try to prove . . . [did] this defendant have implied malice in his mind or not when he drove the way he did, and that is a subjective standard. So we have to find out what he was exposed to that most people aren't exposed to in order to understand his level of awareness of the dangers of driving badly." (Italics added.)

The real danger presented by drunk driving, in other words, is not intoxication itself, but its conduciveness to recklessness and the significant public threat the *latter* conduct presents. Nor was this truth lost on the trial court. In his bench ruling on the evidentiary point, Judge Kroyer observed that "When you are a drunk driver, the only reason you pose a danger to people is if you drive badly in addition to drinking too much, drinking too much and obeying the conditions of the road doesn't produce bad consequences, it's the crashing of cars and the killing of people that *increases one's subjective awareness of the perils of driving badly and speeding and crossing over double yellow lines and passing unsafely* . . . ." (Italics added.) In other words, at least for the analytical purposes underlying the admissibility issue under section 1101(b), it does not matter whether alcohol or other inebriates are involved in the uncharged misconduct or whether it is caused by something else. For that reason we conclude, as did the trial court, that the evidence of defendant's previous misconduct involving the use of alcohol was relevant and admissible in this prosecution for vehicular murder.[5] That conclusion, however, raises a second close question—whether the uncharged misconduct evidence should have been barred as inadmissible under section 352. We take up that question next.

## II

The high court's opinion in *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757], an uncharged misconduct case, furnishes the baseline for this leg of our inquiry. "Our conclusion that section 1101 does not require exclusion of the evidence of defendant's uncharged misconduct, because the evidence is relevant to prove a . . . fact other than defendant's criminal disposition, does not end our inquiry. Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," the uncharged offenses are admissible only if they have substantial probative value. [Citation.]' " (*Id.* at p. 404, bracketed material in original, italics omitted.)

---

[5]In so holding, we adopt the same caution urged by our high court in *People v. Watson, supra,* 30 Cal.3d 290: "[W]e neither contemplate nor encourage the routine charging of second degree murder in vehicular homicide cases." (*Id.* at p. 301.)

■ Critical to this second inquiry is the relaxed standard under which an appellate court reviews evidentiary determinations by the trial court—the familiar "abuse of discretion" standard. (See, e.g., *People v. Thompson* (1988) 45 Cal.3d 86, 111 [246 Cal.Rptr. 245, 753 P.2d 37]; *People v. Schader* (1969) 71 Cal.2d 761, 780 [80 Cal.Rptr. 1, 457 P.2d 841], and cases cited.) What Witkin terms the "classic statement" of the contours of the trial court's discretionary power appears in the early case of *Bailey v. Taaffe* (1866) 29 Cal. 422, 424, where the court wrote that the " 'discretion intended . . . is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal § 358, pp. 406, 407.)

■ In making its ruling under section 352 on the admissibility of the prior uncharged misconduct evidence offered by the prosecution, the trial court heard first from counsel for both sides at a hearing held on March 8, 2001, and again at a second hearing on March 15. It is plain from a review of the transcript of those proceedings that the trial court was fully conversant with both the relevant statutory and the relevant case law; counsel and the court discussed at some length the meaning and significance of many of the precedents we have discussed above. Moreover, in delivering his ruling on the admissibility issue, the trial judge neither granted nor rejected admission of the proffered evidence in toto. Instead, he ruled some of the People's evidence admissible and some inadmissible. The latter—consisting of videotapes shown to those attending SB-38 educational programs—was disallowed by the trial court on the ground that, while "relevant, . . . under 352 they're not admissible in this case. [¶] They deal exclusively with the dangers of drinking too much and driving and only collaterally with crashes as a result of bad driving . . . . [A]ll the case studies that are talked about in those videos deal with drinking and driving. This case doesn't involve alcohol. They are entirely too prejudicial to be admitted here. Their prejudicial value, because they deal so much with alcohol and graphic and gruesome and sad and heart-rending stories their prejudicial effect far outweighs any probative value the particular videotapes have."

On the other hand, the trial court ruled the probative value of other evidence of uncharged misconduct outweighed its prejudicial impact and that its admissibility thus survived scrutiny under section 352. As the court explained its ruling to counsel: "You make a point that intoxication is always talked about as the gravamen of these types of cases . . . . [¶] No published opinion has said that reckless driving or a series of vehicle code violations

by themselves are insufficient to prove malice. [*People v.*] *Contr[e]ras* [*supra*, 26 Cal.App.4th 944] explicitly said the absence of intoxication does not preclude a finding of malice. From that I have come to conclude that if the jury so finds, they can convict somebody of second degree murder based on implied malice in a vehicular collision homicide like this if they think the circumstances are egregious enough to warrant that after being instructed on the law. [¶] . . . [¶] So what I've got to do is discern from all the published opinions what is the general feeling of the Supreme Court and Courts of Appeal in this area. And it seems to me that they have said in a variety of ways, beginning with the mere fact of a prior drunk driving conviction being relevant, they have said that when a person repeatedly violates the law while driving a motor vehicle, and is repeatedly apprehended for those offenses, and convicted of those offenses, and presumably becomes more and more aware of the danger of that activity as time goes by, that that evidence can support a finding of implied malice."

In addition to the transparency of this reasoning supporting its evidentiary determinations, a handful of other considerations support the trial court's ruling. First, as the trial court itself pointed out, "[n]one of the prior events [i.e., the uncharged misconduct at issue] is anywhere near as dramatic as the current crime in question." This observation echoes a like comment in the Supreme Court's *Ewoldt* opinion, examining the contours of section 352: "The testimony describing defendant's uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses. This circumstance decreased the potential for prejudice, because it was unlikely . . . that the jury's passions were inflamed by the evidence of defendant's uncharged offenses." (*People v. Ewoldt, supra,* 7 Cal.4th at p. 405.) Moreover, defendant had been punished—via convictions—for the prior bad acts introduced before the jury, a circumstance courts have acknowledged lessens its prejudicial impact. For, "[a]lthough such evidence is always prejudicial, the impact was minimized by proof of the [prior] conviction. It validated the evidence and minimized the chance a jury would punish [the defendant] for the prior offense, for which he had already been punished." (*People v. Kelley* (1997) 52 Cal.App.4th 568, 579 [60 Cal.Rptr.2d 653].)

In addition to these considerations supporting the trial court's contested evidentiary rulings, the fact that the jury was given CALJIC Nos. 2.09 (Evidence Limited as to Purpose) and 2.50 (Evidence of Other Crimes)— telling them in effect that the uncharged misconduct evidence could be considered only for the limited purpose of determining whether defendant had the required specific intent—further reduced the potential for any untoward effects of the evidence. Last, as our account of the trial court proceedings makes clear, rather than admit or bar the whole of the challenged

evidence, Judge Kroyer crafted an evidentiary ruling limiting the prosecution to the uncharged misconduct evidence that was most relevant, evidence that was highly probative on the central issue of defendant's mens rea.

### III

These multiple considerations supporting the trial court's ruling aside, our review of the record convinces us that, *assuming* it was error to admit the challenged evidence, its impact in these circumstances was not prejudicial. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The jury heard evidence of defendant's reckless driving that September morning, of his sudden lane changes, and of the speeding that preceded the fatal impact. Defendant admitted driving at 100 miles an hour just preceding the collision; the evidence showed he was chasing the car driven by his estranged wife, that there was nothing wrong with his truck, and that he had time within which to swerve back into the northbound lane before crashing into the Piltons' Taurus. And, it heard from an expert witness that, given the roadway terrain at the scene—a "series of subsequent blind curves and visual obstructions," and "all double yellow[]" center lines—each subsequent pass "would increase the risk of having a collision." In addition to those circumstances, the jury heard evidence of three other acts of reckless driving by defendant, the admissibility of which he does not challenge on appeal.[6] These incidents alone would have been sufficient to sustain a finding of implied malice. ▮▮▮ In light of these circumstances, if the trial court erred in admitting the challenged evidence, we conclude it did not affect the outcome.[7]

---

[6]The jury heard evidence of a 1993 citation for crossing over double-yellow traffic lines on the Silverado Trail, of an April 2000 citation for speeding, and a June 2000 incident in which he again crossed a double-yellow traffic line on Highway 29.

[7]We utilize this footnote to dispose of a second issue—now moot—presented by defendant in his opening brief, the question whether it was error for the trial court to give the jury CALJIC No. 17.41.1, an instruction telling the jurors they were under an obligation to advise the trial court if, during the course of deliberations, any one of them "refus[ed] to deliberate or express[ed] an intention to disregard the law, or . . . decide the case based on penalty or punishment or any other improper basis . . . ." (CALJIC No. 17.41.1.) After defendant's opening brief had been filed with the court, the California Supreme Court decided *People v. Engelman* (2002) 28 Cal.4th 436 [121 Cal.Rptr.2d 862, 49 P.3d 209], holding use of the instruction did not violate the defendant's federal or state constitutional rights or qualify as error under state law. (*Id.* at pp. 439-440.) The high court went on to rule, however, that the instruction created an unnecessary and inadvisable risk to proper jury deliberations and should not be given in the future. (*Id.* at p. 448.) The trial record here shows there were no reports during the jury's deliberations that any juror refused to deliberate or expressed an intention to disregard the law or to decide the case on an improper basis. Here, as in *Engelman*, any risk posed by use of the instruction failed to materialize, making reversal on this ground unwarranted.

## CONCLUSION

The judgment of the superior court is affirmed.

Kay, P. J., and Reardon, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 20, 2003. Baxter, J., did not participate therein.