Filed 4/22/16  P. v. Steward CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JASON JEREAMY STEWARD,<br><br>    Defendant and Appellant. | B258993<br><br>(Los Angeles County<br>Super. Ct. No. TA123374) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Shultz, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Jason Jereamy Steward appeals his convictions for three counts of murder and three counts of gross vehicular manslaughter while intoxicated after a fatal collision killing two children and their mother and injuring several others. We affirm.

## PROCEDURAL BACKGROUND

Appellant was charged with nine counts, including three counts of murder (Pen. Code, § 187, subd. (a)),[1] three counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), one count of driving under the influence causing injury (Veh. Code, § 23153, subd. (a)), one count of driving with a blood alcohol content of more than 0.08 percent causing injury (Veh. Code, § 23153, subd. (b)), and one count of leaving the scene of an accident (Veh. Code, § 20001, subd. (a)). It was alleged for the manslaughter counts that appellant left the scene of the accident. (Veh. Code, § 20001, subd. (c).) It was also alleged appellant had two prior serious or violent felonies (Pen. Code, §§ 667, subds. (a)-(i), 1170.12, subds. (a)-(d)) and had served a prior prison term (Pen. Code, § 667.5, subd. (b).)

In a first trial, the jury found appellant guilty of the two counts of driving under the influence causing injury and driving with a blood alcohol level more than 0.08 percent causing injury, and found true enhancements for personal infliction of bodily injury (§ 12022.7, subd. (a)) and proximately causing great bodily injury (Veh. Code, § 23558). The jury deadlocked on the remaining counts and the trial court declared a mistrial on them. We affirmed those convictions in a prior appeal, case No. B254834. After retrial, a second jury found appellant guilty of the three counts of second degree murder and three counts of manslaughter, and found the enhancements true.[2] Appellant admitted his prior convictions, and the court sentenced him to total of 171 years to life for all counts.

---

[1] All undesignated statutory citations are to the Penal Code unless otherwise noted.

[2] The count of leaving the scene of the accident was dismissed pursuant to section 1385.

# FACTUAL BACKGROUND

On May 27, 2012, the day before Memorial Day, Juan Carlos Martinez, his wife Lynzne, and his three young children—eight-year-old Brianna, three-year-old Loryana, and infant Aiden[3]—attended a barbecue at the house of their family friend Oscar Angues, Jr., in Los Angeles. The family stayed overnight, and in the morning around 7:00 a.m. Angues, Jr., started to drive the family home in his Chevy Tahoe. His father, Oscar Angues, Sr., rode with them. Angues, Jr., stopped at a stop sign at the end of his street and looked both ways for cross traffic. He saw a white Cadillac about a block and a half away. Believing it was safe, he turned left. As he did, he realized the Cadillac was coming at him fast. The Cadillac swerved across the yellow line into his lane, and hit the Tahoe. The collision flipped the Tahoe onto its side.

During the crash, Angues, Jr., blacked out. When he woke up, he was able to get himself out of the Tahoe. He saw Brianna lying on the street and tried to wake her up, but she had passed away. He saw appellant crawl out of the passenger side of the Cadillac. He also saw Loryana's head sticking out the back window of the Tahoe. Juan was thrown from the vehicle and blacked out. When he came to, he saw Lynzne lying near the Cadillac, and when he approached her, he knew she had passed away. Bystanders helped remove Aiden and Loryana from the Tahoe. A passerby called 911 and paramedics and firefighters arrived shortly thereafter.

Angues, Jr., noticed appellant "limping" and running away from the scene, so he screamed at appellant, "Where you going? Why you leaving? You just hit us." Appellant did not respond. Angues, Jr., followed him and saw him crawl under a parked vehicle. Angues, Jr., cursed at him and waved down a deputy. He told the deputy, "Hey, this man over here is the guy that killed my family." When appellant failed to respond to police commands to come out, three officers pulled him out.

Autopsies were performed on Lynzne, Brianna, and Loryana, the details of which we will discuss below. They all died as a result of the crash. As stipulated at trial,

---

[3]     We refer to the members of the Martinez family by their first names for clarity.

3

everyone else in the Tahoe was seriously injured. Angues, Sr., suffered two broken ribs, a bilateral nasal bone fracture, and a thumb fracture. Angues, Jr., suffered blunt force trauma to the head, a dislocated clavicle, and soft tissue injuries to his right knee, left neck, and left shoulder. Juan suffered a mild traumatic brain injury, blunt force trauma to the head, a fracture of the lower left tibia, and a fracture of the top of the left shin bone. Aiden was admitted to the pediatric intensive care unit at Long Beach Memorial Medical Center, where he was treated for blunt head trauma, facial contusions, a contusion to the left front lobe of his brain, and a subarachnoid hemorrhage of the left parietal lobe of the brain. Appellant suffered a fracture of his lower leg bone just above his ankle, abrasions to his forehead, right knee, wrist, forearm and shin.

Both cars had airbag modules that recorded their speeds just before the crash. At five seconds before the crash, appellant's Cadillac was traveling at 83 miles per hour; at four seconds, it was traveling at 86 miles per hour; at three seconds, it was traveling at 90 miles per hour; at two seconds, it was traveling at 92 miles per hour; and at one second, it was traveling at 89 miles per hour. In contrast, at five seconds before the crash, Angues, Jr.'s Tahoe was moving at four miles per hour; at four seconds, it was moving at two miles per hour; at three seconds, it was moving at three miles per hour; at two seconds, it was moving at 10 miles per hour; and at one second, it was moving at 16 miles per hour. There was no posted speed limit for the street where the crash occurred, but a reasonable speed would have been 45 miles per hour. Although the respondent's accident expert could not say definitively whether Angues, Jr., came to a full stop at the stop sign, he opined appellant was the primary cause of the collision.

At the hospital after the accident, appellant appeared to be intoxicated and told a nurse he was there because the police broke his foot. He denied he was involved in an accident and said his last drink was a week earlier. A blood sample taken from him at 8:58 a.m. showed a blood alcohol level of 0.29 percent. That level would result from drinking at least fourteen 12-ounce beers, and a person would be mentally impaired to operate a motor vehicle.

4

As we will discuss in more detail below, appellant had been arrested on March 16, 2012, for driving under the influence of alcohol after he rear-ended another car at a sobriety checkpoint. A blood sample taken from appellant after the incident showed a blood alcohol level of 0.13 percent. At the time of the current collision, his license was suspended as a result of this arrest.

## DISCUSSION

### 1. The Court Did Not Abuse Its Discretion in Admitting Coroners' Testimony About the Victims' Autopsies.

Appellant argues the trial court erroneously admitted detailed testimony from the coroners, who performed Lynzne's, Loryana's, and Brianna's autopsies, which he claims violated his due process and fair trial rights. Although he objected to the admission of certain photographs of the victims (which are not at issue on appeal), he failed to object to the admission of the coroners' testimony, so he has forfeited this claim. (Evid. Code, § 353, subd. (a); *People v. Alvarez* (1996) 14 Cal.4th 155, 186.) To avoid forfeiture, he argues his trial counsel was ineffective for failing to object. "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.) As we will explain, appellant's claim lacks merit, so his counsel did not perform deficiently by failing to object. (*Carter, supra*, at p. 1210.)

### A. Coroners' Testimony at Trial

Dr. Raffi Djabourian performed the autopsy on Lynzne. An external examination revealed injuries to nearly every part of her body, including lacerations to the back of her head and a five-inch laceration to her face, along with a large area of abrasion, exposing her jaw bone. She had numerous abrasions and scrapes on her chest, both arms, left buttock, left thigh area, and left leg. Her right thigh bone was fractured. The skin between her cheek and ear was "essentially scraped off," and her jawbone was exposed.

5

To conduct an internal examination, Dr. Djabourian removed part of the skull and made an incision through the chest and abdomen. The examination revealed internal injuries, including a neck fracture and injury to the spinal cord, bleeding around the spinal cord, rib fractures on both sides of the rib cage, fractures to both collarbones, hip fracturing, fractures in some of the small bones in the right hand, and a fractured thigh bone. There was bleeding in both chest cavities, most prominently on the left side due to a laceration of the lung, which would cause difficulty breathing. There was also bleeding in the abdomen due to liver and spleen lacerations. The cause of death was multiple blunt traumatic injuries.

Dr. Louis Pena performed the autopsy on Loryana. An external examination revealed a large area of bruising on her head, an abrasion across her neck, and bruising on her chest and legs. Her neck was "loose," and her legs had "deformities" as the result of fractures. Dr. Pena started the internal examination by making a "Y" incision from the shoulders down to the pubic bone and pulling back the skin and soft tissue in the area. Then he used "like, tree pruners that you trim your tree with" to remove the chest plate to examine the heart and lungs. He also removed the soft tissue from the neck. The right chest cavity contained a significant amount of blood, the right lung was bruised, collapsed, and torn away from the blood vessels. The ribs did not break because they remained flexible in children. The neck was fractured, with the sixth vertebrae "completely broken off." The spinal cord was "completely severed off," stopping respiration and the heart, and causing blood to enter the brain area. Death would have been instantaneous. Dr. Pena then summarized: "The neck injury with the completely severed cord. Heart rate stops, respiration stops; chest cavity injury, blood accumulates. She's gonna have trouble breathing alone if she would have lived, but she wouldn't." He further noted the right thigh bone was "completely broken in half" and bones around the left kneecap were "completely cracked off." The cause of death was multiple traumatic injuries.

Dr. Ogbonna Chinwah performed the autopsy on Brianna. An external examination revealed multiple injuries to the head, face, neck, arms, lower back, hip, and

6

lower abdomen.  There were abrasions and lacerations on the left side of the face, extending to the cheek and around the eye.  There was a major contusion on the left side of the neck, from front to back.  There were abrasions, contusions, and lacerations on the arm.  There were also small abrasions on the lower back and hip.  To conduct an internal examination, Dr. Chinwah "opened the body from the head to the chest, the abdomen, everything," revealing a "fracture in the upper part of the neck where the neck bone connects to the skull.  It was totally fractured and separated from the head itself.  So, there was a major fracture there.  [¶]  And when I opened the head, there was some hemorrhage inside -- inside the brain."  Referring to Dr. Chinwah's notes, the prosecution asked, "it says total separation from the skull?"  Dr. Chinwah responded, "Yes.  I said, fracture of the vertebrae, and I described the medical term of that area, the atlanto-axial joint and total separation from the skull."  The prosecution added, "That's a complete break.  Would that be fair?"  Dr. Chinwah answered, "Yes."  Dr. Chinwah opined, "The severe break was caused by impact of the body violently against a fixed object.  So, if the body was ejected violently and that body hit a fixed object, yes, it is consistent."  Dr. Chinwah confirmed the cause of death was blunt force trauma resulting from "either Briana hitting something violently or something violently hitting her, at least something that wasn't flat."

As part of their testimony, the coroners used diagrams they prepared at the time of the autopsies to explain their findings to the jury.  Those diagrams were admitted into evidence.

### B.  Analysis

The trial court did not abuse its discretion in admitting the coroners' testimony and diagrams because that evidence was relevant to the issues in the case (Evid. Code, § 210) and its probative value was not substantially outweighed by the risk of undue prejudice (Evid. Code, § 352).  (*People v. Williams* (2008) 43 Cal.4th 584, 633-634 [reviewing ruling under Evid. Code, § 352 for abuse of discretion].)  Although the testimony was grim, it was probative of the cause and manner of the victims' deaths and, given the violent nature of the injuries, it corroborated the evidence of the speed and impact of the

vehicles and the locations of the victims' bodies after the collision. This was true even though appellant did not contest the circumstances of their deaths. "'As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim.' [Citation.] Photographs and other graphic evidence are not rendered 'irrelevant or inadmissible simply because they duplicate testimony, depict uncontested facts, or trigger an offer to stipulate.'" (*People v. Thomas* (2012) 53 Cal.4th 771, 806 [finding coroner's testimony relevant to cause and manner of death and to corroborating eyewitness testimony].)[4] Further, with the exception of the arguably unnecessary passing "tree pruners" reference in Dr. Pena's testimony about Loryana's autopsy, the evidence was purely clinical and did not risk evoking undue sympathy from the jury any more than what was already inherent in a case involving the violent deaths of two small children and their mother. Indeed, the jury was presented with photographs of the children's bodies at the scene of the accident, which appellant does not challenge and which were at least as grim as the coroners' clinical testimony about their injuries. Thus, the coroners' testimony may have been "'unpleasant, but not to the point of distracting the jury from its proper function.'" (*Id.* at p. 807.) For these reasons, the admission of this evidence also did not violate appellant's constitutional rights. (*People v. Moon* (2005) 37 Cal.4th 1, 35.)

## 2. *The Trial Court Did Not Err in Setting Time Limits for Voir Dire.*

The extensive voir dire in this case lasted three days, involved two panels of prospective jurors, and comprised nearly 400 pages of reporter's transcripts. After the trial court extensively questioned the jurors, it gave each side 20 minutes to question the

---

[4] Despite appellant's argument to the contrary, we do not see how this testimony could be akin to improper "victim-impact evidence" because it did not relate to the impact of the crime on the victims or their loved ones. (Cf. *People v. Salcido* (2008) 44 Cal.4th 93, 150-151 [wife's testimony regarding last time she saw her husband, the victim, was not victim-impact evidence because it "scarcely touched upon the victim's family life and did not relate the effect of defendant's acts upon family members"].)

8

first panel and 10 minutes to question the second panel. Appellant claims these time limits violated his due process right to an impartial jury. We disagree.

## A. *Voir Dire Proceedings*

The court began voir dire with the first panel by explaining the concepts of the presumption of innocence, impartiality, witness credibility, and appellant's right not to testify, among others. Each juror provided biographical information and indicated whether they had prior jury experience. The court then reviewed the charges and extensively questioned the jurors in the following areas: whether they or anyone close to them had been arrested or charged with driving under the influence; whether they or anyone close to them had been a victim of someone driving under the influence; whether they had strong feelings about alcohol use that would interfere with being a juror; whether they were members of a group advocating for changes in driving under the influence laws; whether they or anyone close to them had been employed with law enforcement agencies; whether they or anyone close to them had been charged with a criminal offense; whether they had any positive or negative experience with law enforcement; whether they were associated with any criminal defense attorneys or prosecutors; and whether they or their loved ones had been victims of any crimes that would interfere with their impartiality.

As the court concluded its own questioning, it reminded counsel each side would have 20 minutes for questioning, which would include questioning further panels if necessary. Defense counsel objected, expressing concern that the time limit might prevent him from questioning other panels. The court reminded counsel he "will be able to voir dire if you use your time efficiently and effectively." Counsel disagreed, explaining, "I can see just with these people here it taking 20 minutes to ask them questions, to ask them—to do a thorough job and professional and good competent job. And I can see myself running out of time, then the subsequent panel I'm not going to be able to voir dire them at all. And I guess that I—that's just—that's not fair, and that deprives my client of his constitutional rights to due process." The court noted the

9

objection but adhered to the 20-minute time limit. The court then asked if counsel had followup questions, and defense counsel said no.

Both counsel were permitted to question the 18 prospective jurors on the first panel. Defense counsel spent a large portion of his allotted time discussing the concept of causation, including soliciting jurors' views on how to apply the concept in a situation in which a person might be driving while intoxicated but not cause an accident. The court read to the jurors the first two paragraphs of CALCRIM No. 620 related to causation for homicide crimes and ensured the jurors could follow it. Using for-cause and peremptory challenges, the parties excused and replaced seven jurors, and the court and parties questioned the new jurors. The court also reread the causation instruction, confirming the new jurors could follow it. Those seven jurors were also excused and replaced. After the court recessed for the day, it informed the parties they had used up their time for voir dire. Defense counsel renewed his objection to the time limit, arguing it was "patently unconstitutional and unfair that we're going to bring strangers into this courtroom and we're not going to be able to voir dire them for cause, not ask them any questions at all." The court noted defense counsel could raise the issue if a new panel was brought in.

Voir dire resumed and the court questioned the new jurors in a similar manner as the previous jurors. Counsels' challenges depleted the first panel, so the court ordered a second panel. Defense counsel again objected to the time limit for voir dire, noting in the first trial each side had been given 20 minutes for questioning. Counsel continued: "But be that as it may, the law provides that we be allotted a reasonable amount of time to inquire of the jurors. And in a life case, you have 34, 35 people, 20 minutes for the entire panel, that's less than 60 seconds a person. And sometimes people answer questions that require follow-up. So, there's really no way one can reasonably anticipate how long it will take. [¶] Now, unreasonable voir dire, I mean that's kind of like pornography. We may not be able to define it, but if we see it, we know it. We recognize it. And I don't think there's been any unreasonable voir dire in this case. I certainly strive never to do that. But to just arbitrarily limit in a life case a certain amount of time, like 20 minutes,

10

to the point where the last six or seven people on the panel that are called up, I don't get to ask them any questions, which would have taken, what, maybe, five minutes, six minutes, given the point where we were, I think that's unreasonable to deprive my client of a fair trial and the right to due process."

The court responded: "Okay. I don't think it's arbitrary at all . . . . I actually listened very carefully to your voir dire which started with the discussion and questions about a fair trial, the anecdote about your mother being carjacked, and then about eight or nine minutes, if not more, on causation. I actually interrupted your voir dire. I didn't want to be rude, but I interrupted your voir dire. I told you that I was going to address the issue of causation. You continued on anyway. You individually questioned each juror about voir dire—excuse me, about the causation. I also asked at the end whether or not you had any supplemental or follow-up questions. You said you had none.

"So, I don't think it's arbitrary at all. I'm allowed to set acceptable limits, and in this case, I believe it's acceptable.

"With that said, I'm going to give you more time with the second panel. I'm not going to give you 20 minutes. I'm going to give you ten minutes each to ask them questions. Again, I encourage you, if you have follow-up or supplemental questions that you want me to ask, I'll be happy to do it, given I think it's an appropriate question.

"But that's the court's ruling. You'll each have ten minutes. I would watch your time very carefully."

The second panel arrived, and the court repeated the voir dire process, with the court and counsel questioning jurors and the court reading the causation instruction. During a break, the court asked if counsel had followup questions for the court to ask, and defense counsel did not. After more challenges, the parties accepted the panel.

*B. Analysis*

Code of Civil Procedure section 223 governs jury selection in criminal cases: "In a criminal case, the court shall conduct an initial examination of prospective jurors. The court may submit to the prospective jurors additional questions requested by the parties as it deems proper. Upon completion of the court's initial examination, counsel for each

11

party shall have the right to examine, by oral and direct questioning, any or all of the prospective jurors. The court may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors by counsel. The court may specify the maximum amount of time that counsel for each party may question an individual juror, or may specify an aggregate amount of time for each party, which can then be allocated among the prospective jurors by counsel. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause. [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted, including any limitation on the time which will be allowed for direct questioning of prospective jurors by counsel and any determination that a question is not in aid of the exercise of challenges for cause, shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

"'The right to voir dire, like the right to peremptorily challenge [citation], is not a constitutional right but a means to achieve the end of an impartial jury. [Citation.] . . . [I]t is the duty of the trial judge to restrict the examination of the prospective jurors within reasonable bounds so as to expedite the trial.'" (*People v. Carter* (2005) 36 Cal.4th 1215, 1251.) The applicable standard of review "is a demanding one: 'Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal. [Citation.] A fortiori, the same standard of reversible error applies when both the court and counsel participate in the voir dire.'" (*Id.* at p. 1250.)

The jury selection in this case was extensive, spanning three days and nearly 400 pages of reporter's transcripts. In evaluating prospective jurors, the court extensively questioned them about the matters designed to uncover any bias or prejudice in this case, including their experiences with crimes and law enforcement, driving under the influence, and their feelings about alcohol use. The court also read the relevant portions

12

of CALCRIM No. 620, the causation instruction for homicide crimes, and asked followup questions to ensure the jurors understood the concept. This benefitted appellant because his primary defense at trial was the lack of causation. In fact, defense counsel used a portion of his initial 20-minute time limit for questioning to discuss the issue of causation as it might apply to the facts in this case. And when defense counsel complained about having no time to question the second panel, the court granted him 10 additional minutes for questioning. (Cf. *People v. Avila* (2006) 38 Cal.4th 491, 536 [noting the trial court's willingness to grant additional time for counsel to question jurors upon a showing of good cause "ameliorated any potential concern that the limitation would somehow be unfair or violate the right to an impartial jury"].) Appellant has not pointed to any line of questioning he was not allowed to ask or any prospective juror who made it onto the jury despite potential bias that could have been uncovered with a longer period of questioning. Defense counsel also twice declined the court's invitation to add followup questions. On this record, the court's limits on voir dire were reasonable and did not violate appellant's constitutional rights.

## 3. *The Admission of Evidence of Appellant's Prior Conduct Was Harmless.*

Appellant contends the trial court abused its discretion and therefore violated his due process and fair trial rights when it admitting evidence pursuant to Evidence Code sections 352 and 1101, subdivision (b) that he rear-ended a car at a sobriety check point on March 16, 2012, while his blood alcohol level was 0.12 percent. We need not decide whether the trial court erred because appellant suffered no conceivable prejudice from the admission of this evidence.

### A. *Evidence at Trial*

On March 16, 2012, Laura Avila was inside her car with her husband when they slowed to almost a stop at a sobriety checkpoint. Appellant rear-ended them with his Cadillac. According to Avila, the impact was "kind of hard. I jerked forward." No one suffered any injuries, her car was not damaged, and she did not make an insurance claim. Appellant's car suffered minor damage to its front end. Appellant apologized to Avila

13

for the accident and said he did not see her car. She believed he was nice but noticed he had slurred speech.

Police officers speaking with appellant noticed an odor of alcohol and that he had red, watery eyes. When asked if he had been drinking, appellant responded he had had one beer. He underwent a series of field sobriety tests, during which he did a "fair job," although he appeared to possibly be under the influence of alcohol. He took breath tests that yielded a blood alcohol level of 0.12 percent, which was over the legal limit of 0.08 percent. He was arrested and taken to the hospital, where a blood sample yielded a blood alcohol level of 0.13 percent. At that level, a person would be impaired to operate a motor vehicle.

As a result of this incident, the Department of Motor Vehicles (DMV) sent appellant an "administrative per se" letter informing him that his driver's license would be suspended 30 days after the date of his arrest. The form allowed appellant 10 days to request a hearing to show the suspension or revocation of his driver's license was not justified. Although a request for a hearing was scheduled for April 27, 2012, it was cancelled, so appellant's suspension went into effect. His license was suspended at the time of the collision in this case.

Evidence from appellant's DMV file showed he completed a driver's license application in February 2010, certifying the following under penalty of perjury: "I'm hereby advised that being under the influence of alcohol or drugs or both impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both. If I drive while under the influence of alcohol or drugs or both and as a result a person is killed, I can be charged with murder."

The jurors were instructed consistent with CALCRIM No. 375 that they "may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant had the knowledge, or the defendant knew that driving under the influence of alcohol or knew that driving with a blood-alcohol level of more than .08 percent was dangerous to human life on May 28, 2012 when he allegedly acted in this

14

case. [¶] Do not consider this evidence for any other purpose except for the limited purpose that the defendant knew that driving under the influence of alcohol or driving with a blood-alcohol level of more than .08 percent was dangerous to human life on May 28, 2012 when he allegedly acted in this case. [¶] Do not conclude from this evidence that the defendant has a bad character or is predisposed to commit a crime. [¶] If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes of murder as alleged in counts 1, 2 and 3 had been proved. The People must still prove each charge beyond a reasonable doubt."

## B. Procedural Background

Before trial, the prosecution sought permission to offer this evidence pursuant to Evidence Code section 1101, subdivision (b). Defense counsel objected, arguing the evidence was irrelevant and unduly prejudicial under Evidence Code section 352. The prosecutor disagreed, citing *People v. Ortiz* (2003) 109 Cal.App.4th 104 (*Ortiz*) to argue the evidence was relevant to prove appellant knew the risk to human life from driving under the influence on the morning of the collision at issue in this case. The court overruled the objection and admitted the evidence, reasoning: "I find it to be relevant, consistent with my ruling in the first trial. I find it to be relevant to the defendant's knowledge. I think the case law does support the introduction of the prior. In this case, it's alleged, but it's not alleged in this information, the prior alleged DUI [(driving under the influence)], because it goes directly to the defendant's knowledge. I don't find at all that it's substantially prejudicial. In fact, I find it extremely . . . probative and not at all overly prejudicial."

## C. Analysis

Evidence of uncharged crimes is not admissible to prove a defendant's criminal disposition, but it may be admitted to prove a defendant's knowledge when relevant to the charged crime. (Evid. Code, § 1101, subds. (a)-(b); see *Ortiz, supra*, 109 Cal.App.4th at p. 111.) "[T]he admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to

15

prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other [Evid. Code,] § 352 concern). [Citations.] [¶] Courts subject other crimes evidence to "'extremely careful analysis'" [citation] and review the admission of such evidence for abuse of discretion [citation]." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.)

We need not decide whether the evidence of the prior accident met these requirements because the admission of this evidence did not prejudice appellant under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [reasonable probability of different verdict].) The evidence of the minor prior incident "pales in comparison to the evidence supporting the charged offense," so there was little risk the jury would have used the instant case to punish appellant for his prior conduct. (*People v. Moore* (2010) 187 Cal.App.4th 937, 943; *Ortiz, supra*, 109 Cal.App.4th at p. 117.) The jury was also instructed not to use this evidence to infer appellant had a criminal propensity, which "further reduced the potential for any untoward effects of the evidence." (*Ortiz, supra*, at p. 118.) And the circumstances surrounding appellant's recklessness causing the fatal collision here—traveling at up to 92 miles per hour on a residential street with a blood alcohol level more than three times the legal limit and crossing the yellow line—overwhelmingly supported the jury's inference that he knew the dangers his drunk driving posed to human life. As the court in *Moore* aptly summarized in affirming a second degree murder conviction under similar facts: "Here Moore drove 70 miles per hour in a 35-mile-per-hour zone, crossed into the opposing traffic lane, caused oncoming drivers to avoid him, ran a red light and struck a car in the intersection without even attempting to apply his brakes. His actions went well beyond gross negligence. He acted with wanton disregard of the near certainty that someone would be killed. [¶] Whether Moore was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk." (*Moore, supra*, at p. 941.) The same is true for appellant here.

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

RUBIN, Acting P. J.

GRIMES, J.

17