Filed 6/25/24  P. v. Doaifi CA4/3
Review denied 10/16/24; reposted with Supreme Court order and statement

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062098 |
| v. | (Super. Ct. No. 18HF1302) |
| AFIFF KEVIN DOAIFI, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Mark W. Fredrick and Courtney L.C. Cefali for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin

Urbanski and Namita Patel, Deputy Attorneys General, for Plaintiff and Respondent.

*     *     *

This is a tragic case that underscores the dangers of speeding. Just before midnight on March 25, 2017, appellant Afiff Kevin Doaifi was driving a modified Chevrolet Camaro at nearly 100 miles per hour on Alicia Parkway in Mission Viejo when he broadsided a Hyundai driven by Judith Noval (the victim). The victim was catastrophically injured and died a month later as a result of her injuries. During a three-year period from 2013 to 2016, Doaifi had been cited by law enforcement five times for speeding, including one citation for driving 109 miles per hour in a 65 miles per hour zone. Prior to the collision, Doaifi attended traffic school twice and admitted on the record to a traffic court judge that he knew "it was dangerous" to speed. The People charged Doaifi with a single count of second degree murder under a theory of implied malice. (Pen. Code, § 187(a).)[1] A jury found Doaifi guilty and the trial court sentenced Doaifi to 15 years to life in prison.

On appeal, Doaifi contends there was insufficient evidence from which the jury could conclude he had *subjective* knowledge before the collision that speeding was dangerous to human life, a requisite element of second degree implied malice murder, or what is commonly referred to as a *Watson* murder. (*People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).) Doaifi also contends the trial court erred in admitting certain evidence at trial, including his history of speeding, testimony regarding the curriculum at court-approved

_____

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

traffic schools, certain statements he made during his interactions with law enforcement and the traffic court, and his post-collision statements and conduct.

We find substantial evidence supports the jury's finding that Doaifi was aware of the potential danger to human life of speeding before he decided to drive at an excessive speed that night. We find no error in the court's admission of evidence of Doaifi's history of speeding, including the traffic citations, attendance at traffic school, and audio recording and transcript of his appearance in traffic court, all of which were relevant to his subjective knowledge of the dangers of speeding. We also find no error in the court's admission of Doaifi's post-collision statements, which are admissions by a party opponent and relevant to the issue of whether Doaifi exhibited a conscious disregard for human life. We reject the remainder of Doaifi's objections under Evidence Code section 352 because Doaifi failed to show any prejudice given the substantial other admissible evidence against him.

We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Just before midnight on March 25, 2017, Doaifi was driving at a high rate of speed in his Chevrolet Camaro eastbound on Alicia Parkway in the city of Mission Viejo when he broadsided the victim's Hyundai, causing her to suffer catastrophic injuries that eventually led to her death. The electronic data recorder from Doaifi's vehicle revealed he was driving at a speed of 99 miles per hour just 2.5 seconds before the impact. The speed limit on that section of Alicia Parkway was 45 miles per hour.

The collision occurred on Alicia Parkway where it intersects with Althea Avenue. The area around that intersection is residential. Alicia Parkway has three lanes on each side in the eastbound and westbound

3

directions.  The intersection at Alicia Parkway and Althea Avenue did not have a traffic signal but included left-hand turning lanes on both sides of Alicia Parkway adjacent to the center divider.

Doaifi grew up in Mission Viejo and was familiar with the area where the collision occurred.  He was 23 years old at the time, and his Camaro was his passion.  The mufflers were not factory installed and Doaifi had modified the car to make it loud.  Doaifi had removed the catalytic converter, which increased the power of the engine.  The rear tires were larger than the manufacturer's recommended size and were considered drag racing tires.

Just before the incident, Doaifi was seen speeding on the Interstate 5 Freeway at approximately 90 miles per hour.  After taking the Alicia Parkway exit, Doaifi drove eastbound, initially driving at the speed limit.  But approximately 400 yards before the scene of the impact, Doaifi appeared to floor the accelerator, which caused the engine to rev and make a loud noise.  At that point, Doaifi was in the middle lane on Alicia Parkway, driving eastbound.  Meanwhile, the victim was driving on Alicia Parkway in the westbound direction and had stopped her Hyundai in the left-hand turning lane where Alicia Parkway intersects with Althea Avenue.  Doaifi could see the victim's headlights.  The victim was attempting to turn left onto Althea Avenue when Doaifi's Camaro broadsided her at a high rate of speed.  One second before the impact, Doaifi slammed on his brakes and turned his steering wheel in an attempt to avoid the collision, but he was unable to do so because of the excessive speed at which he was traveling.[2]  The force of the

_____

[2]  The People's accident reconstruction expert testified if Doaifi had been driving at the speed limit, he could have avoided the collision.

4

impact flipped Doaifi's Camaro onto its roof, but Doaifi and his passenger (his girlfriend at the time) were able to quickly exit with only minor injuries. The victim's car came to rest approximately 20 to 30 feet from where Doaifi's car landed. The victim was found unconscious with shallow breathing on the passenger seat of her car.

At the scene of the collision, witnesses described Doaifi as irate, erratic, swearing a lot, and blaming the other driver for pulling out in front of him. Doaifi was out of his vehicle and walking, but did not approach the victim's car, inquire about, or express any concern for its occupants. According to witnesses at the scene, Doaifi admitted after the collision he had been speeding, but said he was only driving 55 miles per hour, and was yelling about the condition of his car and wanting medical attention for his passenger.[3]

In his recorded 911 call, Doaifi repeatedly expressed concern about his Camaro, saying (among other things), "Oh, my God. My car," "My car," and "[m]y [expletive] car." Doaifi admitted to the 911 dispatch operator he had hit the other driver's car, but he blamed the other driver for turning in front of him.

The victim suffered multiple injuries from the crash, including fractures to her neck and right temporal skull, liver and adrenal lacerations, a tear in her diaphragm, and fractures in her wrist and finger. She died approximately one month after the collision as a result of complications from blunt force traumatic injuries.

---

[3] Months after the collision, Doaifi continued to state he did not believe he was driving more than 55 or 60 miles per hour at the time of the collision.

To prove Doaifi knew the dangers of speeding before the collision, the People introduced evidence at trial showing that before this fatal collision, Doaifi had been cited for speeding five times in three years and had attended traffic school twice.[4]  One of the speeding violations was for driving 109 miles per hour on the freeway, which Doaifi contested.  At his traffic trial on that citation, Doaifi did not deny he was speeding, but testified he did not think he was going over 100 miles per hour.  The traffic court expressed concern about Doaifi's multiple prior citations.  When the court asked Doaifi how to get him to stop speeding, Doaifi responded "[w]ell, Your Honor, this is a pretty big wake-up call to be honest."  Doaifi admitted on the record that speeding was "dangerous."  Despite that admission, and despite what Doaifi described as his "wake-up call," he received another speeding citation after that traffic trial.

Doaifi testified at his murder trial.  Among other things, he testified to the following:  He did not understand prior to the collision that speeding was dangerous and could lead to the loss of human life; the topic of speeding and the dangers of speeding were not covered in either of the traffic schools he attended; the only consequence Doaifi understood could result from speeding was the risk of fines and having to attend traffic school; before the collision, no one had talked to him about the dangers of speeding; when

---

[4]  Doaifi received his first speeding ticket in April of 2013 when he was 19 years old.  Seven months later, in November 2013, Doaifi again was cited for speeding, for driving 67 miles per hour in a 50 miles per hour zone.  Two months later, in January 2014, Doaifi received another speeding citation, this time for driving 85 miles per hour on the freeway.  Nine months later—on October 29, 2014—Doaifi was cited for driving 109 miles per hour on the freeway.  On January 29, 2016, Doaifi was cited in Mission Viejo for driving 63 miles per hour in a 45 miles per hour zone.

6

asked to explain what he meant when he acknowledged to the traffic court judge that speeding is "dangerous," he claimed he "didn't grasp or understand what was happening in that courtroom, let alone why speeding could be dangerous" and he "really just wanted to kind of agree with the judge in [the] hopes [he] didn't get [his] license suspended." Doaifi admitted he was solely responsible for driving the car at the speed at which he was driving and was unaware of anything wrong with the car that would have caused the vehicle to travel at that speed. He blamed the victim for the collision, testifying she was not in the left-hand turn lane (as other witnesses testified) when she turned in front of him; he insisted if she had been in the proper turning lane, "[he] would have yielded a lot earlier if [he] saw the car." He did not feel he was speeding before the collision. He said the tires on his Camaro were not drag racing tires and the modifications to his Camaro were not for speed. When asked about one of his five prior speeding citations, Doaifi testified he believed he received that ticket because his car was loud and drew attention from law enforcement. He acknowledged that back when he was 23 years old (his age at the time of the collision), going 100 miles per hour did not feel much different to him than going 65 miles per hour.

The jury found Doaifi guilty of second degree murder, and the trial court imposed a sentence of 15 years to life. Doaifi appealed.

## DISCUSSION

### I.

#### SUFFICIENCY OF EVIDENCE IN SUPPORT OF JUDGMENT

Doaifi contends (1) there was no substantial evidence showing he was subjectively aware speeding posed a danger to human life and (2) speeding alone, without evidence of other reckless driving at the time of the

7

collision, is insufficient to support a verdict of second degree implied malice murder.  We disagree with both arguments.

## A.  Standard of Review

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one.  "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'"" (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.)  We "evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Ramos* (2016) 244 Cal.App.4th 99, 104.)  Our application of this standard of review does not permit us to "reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact." (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.)

We presume in support of the judgment every fact that could reasonably be deduced from the evidence (*People v. Kraft* (2000) 23 Cal.4th 978, 1053) and disregard any evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient veracity (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316).  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

*B. Implied Malice Second Degree Murder*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "[M]alice may be express or implied." (§ 188, subd. (a).) Malice is express where there is an intent to unlawfully kill. (§ 188, subd. (a)(1).) "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

"'A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.' [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'" (*People v. Elmore, supra,* 59 Cal.4th at p. 133.)

The elements of implied malice are: (1) defendant intentionally committed the act, (2) the natural and probable consequences of his act was dangerous to human life, (3) at the time of the act, the defendant knew his act was dangerous to human life, and (4) defendant deliberately acted with conscious disregard for human life. (CALCRIM No. 520; *Watson, supra,* 30 Cal.3d at pp. 296–297 ["a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard"]; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1217 [implied malice is determined by examining the defendant's subjective mental state to see if he or she actually appreciated the risk of his or her actions].)

*C. Substantial Evidence Supports the Jury's Verdict*

Substantial evidence supports the jury's finding of implied malice second degree murder. Doaifi was driving at an excessive rate of speed—which the Supreme Court has described as "an act presenting a great risk of harm or death." (*Watson, supra*, 30 Cal.3d at p. 301.) Specifically, Doaifi was driving 99 miles per hour at night with other cars on the road in an area that was generally residential and had a speed limit of 45 miles per hour. Doaifi was familiar with this area of Mission Viejo. He was relatively young, but had already received multiple prior speeding citations, including one in which he was driving 109 miles per hour, and had attended traffic school twice. Without more, the jury could infer from these facts that, even if Doaifi had not been aware of the dangers of speeding *before* he received five speeding tickets and attended two rounds of traffic school, he certainly was aware afterward. (See *People v. Murray* (1990) 225 Cal.App.3d 734, 745 [evidence that defendant became subjectively aware of the course material while sitting through a mandatory education course on the dangers of drunk driving is not required; the jury may draw an inference that appellant gained awareness through the experience]; see also *People v. McCarnes* (1986) 179 Cal.App.3d 525, 532.)

But there was more. Doaifi admitted to a judge in traffic court well before the fatal collision that he knew speeding was "dangerous." In addition, at his murder trial in this case, Doaifi admitted he understood *before* the collision speed limits exist for *safety purposes*, and that someone could get injured if a speeding vehicle is involved in a collision. Doaifi's trial testimony directly contradicts his argument on appeal that his history of speeding citations showed only that he knew speeding was unlawful and could lead to fines, not that it was dangerous to human life. (See *People v.*

10

*McCarnes, supra*, 179 Cal.App.3d at p. 532 ["the reason that driving under the influence is unlawful is *because* it is dangerous"].)

Doaifi also argues that speeding alone, without evidence of other bad driving—such as weaving in and out of lanes, running red lights, swerving, racing, or driving under the influence—is insufficient to support a second degree murder conviction. We disagree.

There is no formula for analysis of vehicular homicide cases; "a case-by-case approach" is necessary. (*People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 698.) The lack of some bad driving behavior beyond excessive speed does not preclude a finding of implied malice. Where other evidence shows a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091 ["there is no requirement of a 'predicate act,' i.e., a prior DUI or an alcohol-related accident necessary to establish implied malice"]; *People v. Canizalez* (2011) 197 Cal.App.4th 832 (*Canizalez*) [participating in speed contest in residential area with which defendant was familiar is sufficient to support second degree murder conviction]; *People v. Moore* (2010) 187 Cal.App.4th 937 (*Moore*) [affirming second degree murder conviction where defendant, who was not intoxicated and said he did not intend to kill anyone, drove 70 miles per hour in a 35 miles per hour zone, ran a red light, and struck another motorist causing a traffic fatality]; *People v. Ortiz* (2003) 109 Cal.App.4th 104, 106-107, 119 (*Ortiz*) [defendant drove at excessive speeds in flatbed truck]; *People v. Contreras* (1994) 26 Cal.App.4th 944, 956–957 [tow truck driver racing another tow truck to the scene of an accident with faulty brakes slammed into car stopped at red light, killing passenger; defendant was driving 47–54 miles per hour in a 25 miles per hour zone].) "'Implied malice, like all other

11

elements of a crime, may be proven by circumstantial evidence. [Citations.]' [Citation.] 'The very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act.'" (*People v. James* (1998) 62 Cal.App.4th 244, 277–278.)

The trial court's decision in *Canizalez, supra,* 197 Cal.App.4th 832, is instructive. In that case, the defendant made an argument similar to the one Doaifi makes here. In the face of evidence the defendant engaged in a speed contest that resulted in the death of another, the defendant in *Canizalez* argued there was no evidence he subjectively appreciated the risk of engaging in a speed contest. He argued "murder is not the natural and probable consequence of engaging in a speed contest, because '[i]f it were probable, or likely to occur, . . . then every act of engaging in a street race would be tantamount to an act of attempted murder, which it certainly is not.'" (*Id*. at p. 841.) The court rejected the argument. We do the same with respect to Doaifi's similar contention.

In sum, we agree "[i]t takes no leap of logic for the jury to conclude that because anyone would be aware of the risk [that driving at an excessive speed is dangerous to human life], [defendant] was aware of the risk." (*Moore, supra*, 187 Cal.App.4th at p. 941.) That common sense conclusion—particularly when combined with evidence that Doaifi had twice attended traffic school for speeding violations, had confirmed on the record in a traffic trial that speeding was dangerous, and knew speed limits exist for safety reasons—leaves no doubt that substantial evidence supported Doaifi's conviction of second degree murder.

12

## II.

### CHALLENGES TO ADMISSIBILITY OF EVIDENCE

Doaifi next contends the trial court erred in admitting evidence at trial about his prior speeding citations, testimony regarding the curriculum at California Department of Motor Vehicles (DMV) approved traffic schools, and evidence of Doaifi's post-collision statements and conduct. We find no prejudicial error.

### A. *Standard of Review*

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Moore* (2016) 6 Cal.App.5th 73, 92.) Accordingly, "we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

### B. *Prior Instances of Speeding*

Before speeding nearly 100 miles per hour and crashing into the victim's car, Doaifi had been cited by law enforcement for speeding on *five* separate occasions within a three-year period. He attended traffic school twice and contested the citation for driving 109 miles per hour on the freeway, which led to his appearance in traffic court, where he admitted on the record that speeding is dangerous. When the traffic judge noted Doaifi's prior speeding citations during that trial and asked what it would take to get him to stop, Doaifi assured the court this speeding ticket was his "wake-up call." The People introduced this evidence to show Doaifi subjectively knew speeding was dangerous before the collision that killed the victim.

Over Doaifi's objection, the trial court admitted into evidence the citations themselves, officer testimony, recorded interactions with law

enforcement, and the audio recording and transcript of the traffic trial proceedings. Doaifi argued this was all inadmissible character evidence under Evidence Code section 1101, subdivision (b), because it was intended to show Doaifi's propensity to speed; it contained irrelevant, prejudicial statements from the officer and the traffic court judge; and, in any event, it should have excluded under Evidence Code section 352. None of these arguments is persuasive.

With regard to Doaifi's "propensity" argument: It is true that evidence of other crimes or bad acts (so-called "uncharged misconduct") "is inadmissible to establish a defendant's *propensity* to commit the offense charged." (*Ortiz, supra,* 109 Cal.App.4th at p. 111.) But it is also true—and equally well-established—that there are many exceptions to this rule. (Evid. Code, § 1101, subd. (b); *Ortiz,* at p. 111.) One of those exceptions is where the evidence of uncharged misconduct is relevant to prove some fact other than defendant's disposition to commit the act, including, for example, the defendants "*knowledge.*" (Evid. Code, § 1101, subd. (b), italics added.) Thus, in *Ortiz,* where the defendant was charged with second degree murder following a fatal traffic collision, the appellate court found no error in the trial court's admission of "documentary and oral testimony concerning seven past incidents in which defendant had either been convicted of reckless driving, convicted of reckless drunk driving, or been observed driving recklessly, and his participation in a mandatory education program . . . on the dangers of drinking and driving." (*Ortiz,* at p. 110.) Even though the collision at issue in *Ortiz* did not involve driving under the influence, the court found the evidence relevant and admissible to show the defendant's requisite mental state supporting a finding of implied malice. (*Id.* at pp. 112, 115 [defendant's speeding citations "sensitize[d] him to the dangerousness of

14

such life-threatening conduct"; a jury may infer from prior instances of reckless driving that "the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior"].)

We conclude—as did the appellate court in *Ortiz*—that "[f]rom this uncharged misconduct evidence, through a series of inferences, a jury could conclude that, at the time of the charged misconduct, [Doaifi] possessed a 'wanton disregard for life, and . . . a subjective awareness of the risk created,' from which 'malice may be implied.'" (*Ortiz, supra,* 109 Cal.App.4th at p. 113, italics omitted.)

We also conclude the trial court did not err by refusing to exclude the uncharged conduct evidence under Evidence Code section 352. There is no question the evidence was highly probative to Doaifi's subjective awareness of the dangers of driving at an excessive speed. As explained in *Ortiz*, "'when a person repeatedly violates the law while driving a motor vehicle, and is repeatedly apprehended for those offenses, and convicted of those offenses, and presumably becomes more and more aware of the danger of that activity as time goes by, [that] evidence can support a finding of implied malice.'" (*Ortiz, supra,* 109 Cal.App.4th at p. 118.) We conclude the probative value of this evidence was not "substantially outweighed by the probability that its admission" would "create substantial danger of undue prejudice" (Evid. Code, § 352) for several reasons.

First, none of Doaifi's prior speeding violations had resulted in injury to—much less death of—another. Thus, the testimony regarding Doaifi's prior uncharged acts was "'no stronger and no more inflammatory than the testimony concerning the charged offense[]'"—which "'decreased the potential for prejudice, because it was unlikely . . . that the jury's passions

15

were inflamed by the evidence of defendant's uncharged offenses.'" (*Ortiz, supra*, 109 Cal.App.4th at p. 118.)

Second, the trial court gave the jury detailed limiting instructions regarding the proper consideration of the evidence relating to Doaifi's speeding citations.[5] "'We presume the jury followed these instructions.'" (*People v. Chhoun* (2021) 11 Cal.5th 1, 30 (*Chhoun*).) The court's limiting instructions also "reduced the potential for any untoward effects of the evidence." (*Ortiz, supra*, 109 Cal.App.4th at p. 118.)

For these reasons—and because we review the trial court's evidentiary rulings under the deferential "abuse of discretion" standard

---

[5] The trial court gave the jury the following instructions derived from CALCRIM Nos. 303 and 375:

"During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." (CALCRIM No. 303.)

"The People have presented evidence that the defendant committed offenses of operating a motor vehicle in excess of the posted speed limit that was not charged in this case." (CALCRIM No. 375.)

"If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:

"The defendant knew that his act was dangerous to human life when he allegedly acted in this case;

"or

"The defendant's alleged actions were not the result of a mistake or accident.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense.

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit a crime." (CALCRIM No. 375.)

(*Chhoun, supra,* 11 Cal.5th at p. 26)—we find the trial court did not err by overruling Doaifi's Evidence Code section 352 objection and admitting evidence relating to his prior speeding offenses.

Doaifi relies on *People v. Saucedo* (2023) 90 Cal.App.5th 505 to support his argument that the traffic citations and related evidence should have been excluded. *Saucedo* is easily distinguishable. In *Saucedo,* the defendant collided with another vehicle, killing the occupants, while he was speeding away from police and under the influence of methamphetamine. The People introduced evidence of a string of uncharged offenses: a speeding ticket; a citation for making an unsafe start; possession of methamphetamine and marijuana; possession of drug paraphernalia; possession of burglary tools; making a right-hand turn against a red light without making a full stop; failing to yield to a stop sign; driving on a suspended license; and missing a license plate. The appellate court held this evidence was improperly admitted because "there [was] no evidence that in any of his prior driving incidents appellant was prosecuted or obligated to attend a class regarding the dangers of reckless or intoxicated driving, and none of the prior incidents actually involved any danger to life." (*Id.* at p. 515.) The court nevertheless found the error harmless because the other evidence introduced at trial "was sufficient to support a finding of implied malice *without any consideration of appellant's driving history.*" (*Ibid.*)

Unlike *Saucedo,* Doaifi's uncharged offenses were all directly related to the same offense—speeding—that led to the death of the victim. Further, Doaifi's offenses resulted in his attendance at traffic school, which a jury could infer included education on the dangers of speeding, and in Doaifi's

17

acknowledgment to a traffic court judge that speeding is dangerous. We find the trial court did not err by admitting this evidence.[6]

*C. Testimony Regarding Traffic School Curriculum*

Over Doaifi's objection, the People introduced evidence regarding the curriculum at traffic schools approved by the DMV to establish Doaifi knew about the dangers of speeding from the two traffic schools he completed. Although there was no evidence at trial regarding the specific traffic schools Doaifi attended, evidence established that the dangers of

---

[6] Doaifi also objected to the admission of portions of the traffic court trial transcript in which the traffic court judge expressed "opinions" about Doaifi's driving record and to portions of a recorded conversation between a traffic officer and Doaifi during the issuance of one of Doaifi's speeding citations. With respect to the former: the supposed "opinion" from the traffic court judge was a simple statement of fact, to wit, that Doaifi had "a bunch of speeding charges" that were "not a good track record." As to the latter: Doaifi is heard telling the officer he previously had a suspended license and is on probation. The officer responded that "drivers usually don't get their licenses suspended unless they have a lot of tickets [¶] . . . [¶] or a DUI." Doaifi immediately clarified to the officer that his license had been suspended for a traffic violation, not a DUI. The officer then checked Doaifi's driving record and told Doaifi, "the good news is according to the DMV, your driving record is good. You're not suspended."

Even if we were to assume for purposes of argument that admission of this evidence was an abuse of discretion, there is no showing Doaifi was prejudiced. In light of the other evidence of Doaifi's extensive history of speeding citations, this evidence was almost entirely cumulative. The only arguably new fact referenced in the conversation between Doaifi and the traffic officer is that Doaifi's license had previously been suspended for a traffic violation. But, again, given the strength of the other evidence properly admitted into evidence, Doaifi has not shown—and we cannot conclude—that admission of either the judge's comments or the recording of Doaifi's conversation with the traffic officer was an abuse of discretion that resulted in a manifest miscarriage of justice. (*People v. Goldsmith*, *supra*, 59 Cal.4th at p. 266.)

18

speeding was part of the mandatory curriculum for any traffic school included on the Orange County Superior Court's DMV-approved list of traffic schools that violators, such as Doaifi, could attend to meet their obligation to the court.

The People called the operations manager for Orange County Superior Court's criminal and traffic department to testify about the court's requirements for attending traffic school. She explained the following: Traffic school is a "diversion program" that gives instruction and education on traffic safety. If an individual in Orange County receives a qualifying traffic citation and elects to attend traffic school, the court enters an order permitting the violator to attend traffic school. The violator, however, must choose a traffic school from a list of DMV-approved traffic schools. The list is compiled by the DMV, and the court receives a copy of it every month. Once the violator completes the traffic school, they must provide the court a certificate of completion furnished by the school. At that point, the offense is in essence "erased" from the violator's record for purposes of insurance and "point[s]" on the violator's driving record.

To show the dangers of speeding is a topic covered in all DMV-approved traffic schools, the People called a witness who was both a traffic school instructor licensed by the DMV and a former CHP officer. He testified there is a list of mandatory content criteria that all DMV-approved traffic schools are required to meet, and each school's compliance with those curriculum criteria is monitored by a private company contracted by the DMV. Although the traffic school instructor did not have knowledge regarding the specific traffic schools attended by Doaifi, he testified from personal knowledge that speeding is one of the mandatory topics the DMV

requires all authorized traffic school instructors to teach, including that excessive speed can lead to collisions and be deadly.

Doaifi argues it was error to admit this evidence because the traffic school instructor's testimony lacked foundation and he could not testify, from personal knowledge, that the dangers of speeding were actually addressed at the two specific traffic school programs Doaifi attended. We disagree. The evidence was sufficient to establish that, although there were no "script[s]" traffic school instructors were required to follow, all court-approved traffic schools were required to include in the curriculum warnings about the dangers of speeding, including that speeding can lead to collisions and death. For Doaifi to have completed a court-ordered traffic school in connection with his speeding citations, he had to attend a DMV-certified class on the list provided by the Orange County Superior Court. From this, the jury could logically and fairly infer that Doaifi attended DMV-approved schools and was instructed in both of them about the dangers of speeding. In addition, the jury was free to reject as not credible Doaifi's testimony that the dangers of speeding were not addressed in the two traffic schools he attended, and instead draw on their own life experiences to conclude otherwise. (See *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 66, 77–78 [it was not misconduct for juror to draw on life experiences at work to evaluate the defendant's credibility regarding what he said happened at work; jurors may refer to their own life experiences when judging a witness's credibility]; *People v. Steele* (2002) 27 Cal.4th 1230, 1265–1267 [court did not abuse its discretion in denying new trial motion where jurors with former military experience drew on their experiences to reject the defendant's claim he was trained to kill in Seal training because they attended the same schools and had not learned to kill].)

Even if the traffic school instructor's testimony about the standard, DMV-mandated curriculum was inadmissible, Doaifi failed to show he was prejudiced by its admission. "'"Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"'" (*Chhoun, supra*, 11 Cal.5th at p. 26.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) A "reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 688, 694.)

Based on the full record here, it is not reasonably probable a result more favorable to Doaifi would have been reached had the trial court precluded the traffic school instructor's testimony. We need look no further than Doaifi's admission to the traffic judge during his earlier traffic trial that he knew speeding is dangerous. Based on that admission, testimony showing the dangers of speeding were covered in DMV-approved traffic schools such as those Doaifi attended would simply have reiterated what was already in the record. (*McCoy v. Board of Retirement* (1986) 183 Cal.App.3d 1044, 1054 [error in admission of evidence "'is not prejudicial if the evidence "was merely cumulative or corroborative of other evidence properly in the record"'"].)

D. *Doaifi's Post-Collision Conduct*

Doaifi sought to exclude his 911 call under Evidence Code section 352. The jury heard an audio portion of his recorded call and received a

transcript of the 911 call Doaifi made at the scene of the collision. We conclude the trial court did not abuse its discretion in allowing Doaifi's 911 call to be played to the jury.

First, the 911 call included Doaifi's admission that he struck the other vehicle and his explanation of how the crash occurred. That was relevant. In addition, a jury could reasonably conclude Doaifi's remarks immediately after the collision evidenced a callous or conscious disregard for the safety of others. (*Watson, supra*, 30 Cal.3d at p. 296 [implied malice involves an element of "wantonness," i.e., acting deliberately with conscious disregard for life]; see *Canizalez, supra*, 197 Cal.App.4th at p. 844 [holding the defendants' "callous disregard for the safety of others was no more evident than by their conduct after the crash," including showing "no remorse or concern" for the victims and making "no effort to help the victims or even inquire about their condition"].) Doaifi was upset about his car and in the immediate aftermath of the collision showed no concern for the occupant (or occupants) of the other car or any injuries they may have suffered. Indeed, there is no indication in his call to the dispatcher that he had even checked on the status of the driver of the other car or sought to determine if there were any passengers in it. Although we agree portions of Doaifi's comments to the 911 dispatcher did not paint him in a positive light, the standard of "'prejudicial'" under Evidence Code section 352 is not synonymous with "'damaging.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "Painting a person faithfully is not, of itself, unfair." (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.)

We cannot find the probative value of Doaifi's 911 call was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice and that no reasonable judge could

22

conclude otherwise. The trial court did not abuse its discretion in admitting it. Even if we were to assume it was error, however, based on the very damaging evidence otherwise in the record, including Doaifi's acknowledgement at his trial for one of his earlier speeding violations that speeding is dangerous, any error would be harmless. Even without the jury hearing the 911 call, it was not reasonably possible Doaifi would have obtained a more favorable result at trial.

III.

CUMULATIVE ERROR

Finally, Doaifi contends the cumulative prejudice of the alleged foregoing errors compels reversal of his murder conviction. We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.) However, the rejection of each of a defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate." (*In re Reno*, at p. 483.)

Here, there is no prejudice to cumulate or analyze.

## DISPOSITION

The judgment is affirmed.


GOODING, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOTOIKE, J.

Court of Appeal, Fourth Appellate District, Division Three - No. G062098

**S286155**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

AFIFF KEVIN DOAIFI, Defendant and Appellant.

_____

The petition for review is denied.


(See Concurring Statement by Evans, J., joined by Liu, J.)


_____/s/_____
*Chief Justice*

PEOPLE v. DOAIFI

S286155


Concurring Statement by Justice Evans


Twenty-three-year-old defendant Kevin Afiff Doaifi was convicted of second degree murder after a tragic accident. Doaifi, traveling at an excessive speed adjacent to a residential neighborhood late at night, collided with another driver attempting to make a turn from the opposite direction of a six-lane thoroughfare. Doaifi was not impaired, nor was there evidence that he was swerving or weaving through traffic or running stop signs or traffic lights. The evidence suggested that no cars were in front of Doaifi until the victim made an unprotected left turn. Immediately before the accident, Doaifi was traveling 99 miles per hour in a 45-mile-per-hour zone. In the three years prior to this incident, he had received traffic citations for speeding on five separate occasions resulting in two courses of online traffic school. In one of the prior incidents, Doaifi had been driving 109 miles per hour in a 65-mile-per-hour zone. During traffic court proceedings arising from this prior incident, Doaifi admitted that speeding was "dangerous."

The resolution of this case does not turn on whether Doaifi was subjectively aware that speeding was wrong, or that speeding was dangerous. But to warrant application of second degree murder liability, our cases require satisfaction of an objective component. Specifically, "the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must " ' "involve[] a high degree of probability that it will

1

result in death." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).) The Court of Appeal below, however, never directly answered whether this requirement was satisfied. Because the objective component of implied murder liability is particularly important to the application of murder liability in vehicular homicide cases, I write separately to urge the lower courts to specifically analyze this factor when assessing implied malice in these circumstances.

Over 40 years ago, in the seminal case *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*), this Court held that under the low standard applicable to preliminary hearings, there was sufficient evidence to hold a drunk driver to answer for second degree murder on a theory of implied malice. (*Id.* at pp. 300–301.)[1] Late at night and in the early morning hours on the day of the homicides, Watson had consumed a large amount of alcohol at a bar. Later analysis revealed that Watson's blood alcohol level content one hour after the collision was .23 percent. (*Id.* at p. 294.) Prior to the collision at issue, Watson had narrowly avoided *another* collision by slamming on his breaks and skidding to a halt in the middle of an intersection. (*Id.* at p. 293.) Immediately prior to the fatal collision, expert testimony indicated that Watson had been traveling 84 miles per hour in a 35-mile-per-hour zone. (*Id.* at pp. 293–294.) As a result of the impact, a mother and her six-year-old daughter were ejected from their vehicle and killed. (*Id.* at p. 293.)

---

[1] Such cases, vehicular homicides charged under a theory of second degree murder, have come to be known as "*Watson* murders." (*People v. Lagunas* (2023) 97 Cal.App.5th 996, 1006.)

2

In characterizing the legal standard under which to assess the sufficiency of the evidence in support of implied malice murder, the Court described two different formulations.  Under one variation, "[w]e have said that second degree murder based on implied malice has been committed when a person does ' " 'an act, the *natural consequences of which are dangerous to life*, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Watson, supra,* 30 Cal.3d at p. 300, italics added.)  Or, "[p]hrased in a different way, malice may be implied when defendant does an act *with a high probability that it will result in death* and does it with a base antisocial motive and with a wanton disregard for human life." (*Ibid.*, italics added.)

Three decades later, concurring in *People v. Cravens* (2012) 53 Cal.4th 500 (*Cravens*), Justice Liu traced the origins of these competing standards. (*Id.* at pp. 512–513.)  One derived from Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470 (*Thomas*), which articulated that implied malice is shown when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (*Id.* at p. 480 (conc. opn. of Traynor, J.).)  The second line derives from *People v. Phillips* (1966) 64 Cal.2d 574 (*Phillips*), overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12, which described implied malice murder as a " 'killing [which] proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with

conscious disregard for life.' " (*Phillips*, *supra*, 64 Cal.2d at p. 587.)

We have repeatedly indicated that these alternative formulations are equivalent. (*Cravens*, *supra*, 53 Cal.4th at p. 512 (conc. opn. of Liu, J.); see also *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104; *People v. Knoller* (2007) 41 Cal.4th 139, 152 ["these two definitions of implied malice in essence articulate[] the same standard"].) However, Justice Liu wrote separately based on his concern that the different phrasing of the standard "matters in a close case." (*Cravens*, *supra*, 53 Cal.4th at p. 514 (conc. opn. of Liu, J.).)

In *Reyes*, writing for a unanimous court, Justice Liu returned to the objective component of implied malice murder, reaffirming that the *Thomas* standard ("a high degree of probability that it will result in death" [*Thomas*, *supra*, 41 Cal.2d at p. 480 (conc. opn. of Traynor, J.)]) was controlling. Reyes was convicted of second degree murder following a homicide committed by a fellow member of Santa Ana's F-Troop gang. Reyes was one of several members or affiliates of F-Troop who were present when the killing occurred, although the evidence showed he was not the shooter. (*Reyes*, *supra*, 14 Cal.5th at p. 984.) Reyes, then 15 years old, was in a park with a group of older boys and young men between the ages of 16 and 21. (*Id.* at p. 985.) All of them were gang members. (*Ibid.*) One of the young men, Francisco Lopez, showed the group that he was carrying a firearm. (*Ibid.*) Reyes and his group, on bicycles, proceeded to an area on the edge of territory belonging to a rival gang. (*Ibid.*) After a brief verbal exchange with riders in a car, the group on bicycles chased the group in the vehicle. Reyes's

4

group and the car came together at an intersection and Lopez shot the driver in the head, killing him.  (*Ibid.*)

Reyes challenged the validity of his conviction on the basis that the jury had been instructed on the since-abolished natural and probable consequences doctrine.  (See Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437); Stats. 2018, ch. 1015, § 2.)  The trial court rejected Reyes's petition for resentencing under Senate Bill 1437, concluding that Reyes was guilty beyond a reasonable doubt of second degree murder under an implied malice theory.  (*Reyes, supra*, 14 Cal.5th at p. 987.)

In reversing the trial court's finding, this Court took issue with the trial court's application of the *Phillips* formulation of the objective component of implied malice murder, namely its conclusion that "the natural and probable consequences" (*Phillips, supra*, 64 Cal.2d at p. 587) of Reyes's act of traveling to rival gang territory with several other gang members, one of whom he knew was armed, and chasing and confronting another group, was "dangerous to human life."  (*Reyes, supra*, 14 Cal.5th at p. 987.)  The *Reyes* opinion explained that "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' "  (*Reyes, supra*, 14 Cal.5th at p. 989.)  It found the evidence insufficient to establish implied malice murder.  (*Ibid.*)

In March 2024, the Judicial Council modified CALCRIM 520 to comply with the clarification provided in *Reyes*.  Implied malice murder now requires that a defendant (1) intentionally engaged in an act; (2) the natural and probable consequences of

5

that act[2] involved a high degree of probability that it would result in death; (3) at the time the person acted, they knew the act entailed that danger; and (4) the person acted with conscious disregard for life. (CALCRIM No. 520; see also Judicial Council of Cal. Crim. Jury Instns. (2024) Bench Notes to CALCRIM No. 520, p. 251.)

Doaifi was convicted of second degree murder after a jury trial. The prosecution introduced evidence of Doaifi's prior citations of speeding and referral to online traffic school, his statements during the proceedings in one of these incidents evincing a subjective awareness that speeding was "dangerous," and his excessive speeding on the night in question.

The Court of Appeal's decision did not cite the objective component of the implied malice standard as articulated in *Reyes*, or the current version of CALCRIM No. 520. Instead, it cited the *Phillips* formulation, stating that " '[m]alice is implied when an unlawful killing results from a willful act, *the natural and probable consequences of which are dangerous to human life*, performed with conscious disregard for that danger.' " The opinion also relied on the prior version of CALCRIM No. 520, without acknowledging that it had been superseded.

Doaifi argues our review is necessary because *Reyes* does not permit a conviction for implied malice murder based on the circumstances of his case, which he characterizes as murder liability based on "excessive speed alone."

---

[2]     "A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes." (CALCRIM No. 520.)

6

As a class, *Watson* murders are unique. Not only do the defendants in such cases lack an *intent* to kill, but they can often claim an opposing intent: an affirmative desire not to harm anyone. Unsurprisingly, it is not uncommon for *Watson* murder defendants, as in this case, to have no prior criminal history of violence. Absent an intent to harm anyone, *Watson* murder cases turn on the defendant's subjective awareness of the objective risks that their grossly reckless behavior poses. However, in some cases, it may be difficult to characterize a *Watson* murder defendant's conduct as demonstrating a "high probability that it will result in death." (*Watson, supra,* 30 Cal.3d at p. 300.) For instance, as Chief Justice Bird noted in her *Watson* dissent, the mere fact of driving while intoxicated is not alone an act with a high probability that it will result in death: "[d]eath or injury is not the probable result of driving while under the influence of alcohol. 'Thousands, perhaps hundreds of thousands, of Californians each week reach home without accident despite their driving intoxicated.' " (*Watson, supra,* 30 Cal.3d at p. 305 (dis. opn. of Bird, C. J.).)[3] The same can be said of speeding.

---

[3]     According to data compiled over the last 40 years published by the California Department of Motor Vehicles, the rate of vehicle fatalities involving alcohol and drugs is only roughly one percent of the total number of convictions under Vehicle Code section 23152. (Rees et al., *DUI Summary Statistics: 1980-2020* (Nov. 2023) Dept. of Motor Vehicles <https://www.dmv.ca.gov/portal/dmv-research-reports/research-development-data-dashboards/dui-management-information-system-dashboards/dui-summary-statistics/> [as of Oct. 16, 2024]; all Internet citations in this opinion are archived by year, docket number and case name at

Because the underlying violations of the Vehicle Code that underpin most *Watson* murder cases are unfortunately commonplace, *Watson* murder cases often present the sort of "close case[s]" (*Cravens*, *supra*, 53 Cal.4th at p. 514 (conc. opn. of Liu, J.)) in which the choice of phrasing of the implied malice standard (now resolved by *Reyes* in favor of the " ' "high degree of probability that it will result in death" ' " [*Reyes*, *supra*, 14 Cal.5th at p. 989]) may make a significant difference.[4] In other words, as a general matter, it is relatively easy to surmise that a defendant's act is dangerous to life "in some vague or speculative sense." (*Reyes*, *supra*, 14 Cal.5th at p. 989.) But to differentiate between gross vehicular manslaughter and second degree murder, more is required.

It is for this reason that *Reyes*'s refinement of the objective component of implied malice is important in *Watson* murder cases. To be sure, in vehicular homicide cases, murder liability may be the appropriate sentence. And this is true even assuming a defendant's credible desire not to harm anyone. Such defendants can be said (subjectively) to exhibit a "a base, anti-social motive and [] wanton disregard for human life"

---

<http://www.courts.ca.gov/38324.htm>.) However, because a large number of intoxicated drivers are neither arrested nor convicted, it is safe to assume that driving while intoxicated results in fatal injury in far less than one percent of cases.

[4] For the same reason, the *Watson* murder doctrine has been subject to substantial academic criticism for its overapplication. (See Freestone, *Elementary My Dear* Watson: *The Evolution to Strict Liability Murder Thirty Years After* People v. Watson (2011) 33 Whittier L.Rev. 243, 243 & fn.5 [noting that scholars have "consistently voiced opposition" to the expansion of *Watson* murder liability].)

8

(*Thomas*, *supra*, 41 Cal.2d at p. 480 (con. opn. of Traynor, J.)) precisely because they are knowingly engaged in an activity that is (objectively) *highly likely to cause death*. (*Reyes*, *supra*, 14 Cal.5th at p. 989.)

Cases such as this one, however, present difficult questions on that score. Speeding is unquestionably dangerous, reckless speeding even more so. But speeding itself, even at a high rate of speed, does not automatically equate to a " ' "high degree of probability that it will result in death." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 989.) Rather, an objective analysis of the risk of speeding must account for a myriad of factors. Speeding on a highway differs from speeding in a residential neighborhood; traveling 100 miles per hour in a 45-mile-per-hour zone is not the same as doing so in a 70-mile-per-hour zone. Other factors such as the time of day, visibility, traffic volume, weather, and road conditions can all be relevant. Expert testimony on traffic fatalities may be needed to objectively establish a "high degree of probability" of causing death that adequately accounts for various risk factors.

The court below did little to consider the conditions in which Doaifi was speeding on the night in question, and it provided no analysis demonstrating that death was the highly probable, or even most probable, result.[5] It cited our unadorned

---

[5] In his initial Court of Appeal briefing, Doaifi did not cite *Reyes*. However, he did argue that implied malice is only present when a "defendant does an act with a *high probability* that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (Italics added; see *People v. Washington* (1965) 62 Cal. 2d 777, 782.) *Reyes,* which had issued almost a year before the case was

statement in *Watson* that excessive speed is "an act presenting a great risk of harm or death." (*Watson, supra*, 30 Cal.3d at p. 301.) But this statement was made in the context of a great amount of other evidence: the defendant in *Watson* was extremely intoxicated, driving erratically, and had almost collided with another car moments before the killing. (*Id.* at pp. 293–294.)

Equally important, the law has been clarified since *Watson*. It is impermissible to equate a speculative "risk" to human life with an act demonstrating a " ' "high degree of probability that death will result." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 989.) The potential confusion between these two competing formulations is precisely what prompted our recent clarification of the standard in *Reyes*. (*Ibid.*) To place the standard in context, a gang member traveling with other gang members (one of whom is armed) to rival territory, and ultimately engaging in a pursuit and confrontation, can certainly be characterized as an act presenting a *risk* of harm or death. (*Ibid*.) But many other non-fatal outcomes are possible, and even likely. Thus, the conduct in *Reyes* was, as a matter of law, insufficient to support murder liability. (*Ibid.*)

---

argued, was controlling authority. Five days after the case was argued and submitted, however, Doaifi's counsel requested to file supplemental briefing articulating the impact of *Reyes* (based on the then-recent change to CALCRIM No. 520, which had occurred one month prior to argument and of which counsel discovered only after argument). The Court of Appeal denied this request as untimely. It also denied a petition for rehearing that argued that it had failed to apply *Reyes* and had applied in the incorrect version of CALCRIM No. 520.

It is unclear whether the court or the jury below concluded that Doaifi's conduct constituted an act with a " ' "high degree of probability that it would result in death." ' " (*Reyes, supra,* 14 Cal.5th at p. 989.) However, it is premature for this court to address the issue now. The application of *Reyes* in the *Watson* murder context is a relatively new legal issue, and the change in jury instruction is of even more recent vintage. Other Courts of Appeal have affirmatively recognized *Reyes* as the controlling standard. (*People v. Superior Court* (*Chagolla*) (2024) 102 Cal.App.5th 499, 515 [citing *Reyes* and affirming trial court's decision to set aside *Watson* murder charge for insufficient evidence under Pen. Code § 995]; *id.* at p. 522 (conc. opn. of Do, J.) [writing separately to highlight that "[i]mplied malice murder cannot be based on a death that is anything less than highly probable."].) Furthermore, the Court of Appeal's failure to address the *Reyes* standard is, at least in part, attributable to Doaifi's counsel's failure to brief the issue in a timely manner. However, if future cases fail to apply, or misapply, the *Reyes* standard in this context, review by this Court may be warranted.

**EVANS, J.**

**I Concur:**
**LIU, J.**