Filed 9/24/25  P. v. Moreno CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>JESUS RODRIGUEZ MORENO,<br><br>　　　Defendant and Appellant. | F087140<br><br>(Super. Ct. No. BF168564A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ian Whitney and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent

-ooOoo-

**INTRODUCTION**

Following a retrial, a jury convicted defendant Jesus Rodriguez Moreno of murder (Pen. Code, § 187, subd. (a)); count 1), gross vehicular manslaughter (*id.*, § 191.5, subd.

(a); count 2) with enhancements for fleeing the scene (Veh. Code, § 20001, subd. (c)) and three prior Vehicle Code section 23152 convictions (Pen. Code, § 191.5, subd. (d)), and hit and run resulting in death or permanent serious injury (Veh. Code, § 20001, subd. (b)(2); count 3), based on an incident during which defendant hit and killed David Rico, a pedestrian, while defendant was driving under the influence of alcohol.

On appeal, defendant asserts insufficient evidence supports his conviction for second degree implied malice murder.

We affirm.

## PROCEDURAL BACKGROUND

In 2019, a jury convicted defendant of murder (Pen. Code, § 187, subd. (a); count 1), gross vehicular manslaughter (*id.*, § 191.5, subd. (a); count 2) with enhancements for fleeing the scene (Veh. Code, § 20001, subd. (c)) and three prior Vehicle Code section 23152 convictions (Pen. Code, § 191.5, subd. (d)), hit and run resulting in death or permanent serious injury to David Rico (Veh. Code, § 20001, subd. (b)(2); count 3), and misdemeanor driving with a suspended or revoked license (Veh. Code, § 14601.2, subd. (a); count 4). Defendant previously appealed and his convictions on counts 1, 2, and 3 were reversed and his sentence was vacated based on the appellate court's conclusion defendant's statements to law enforcement were admitted in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 and the error was prejudicial. The prosecution elected to retry defendant on remand. Retrial began in July 2023. Thereafter, the jury again convicted defendant of counts 1, 2, and 3 and found true the enhancement allegations.

*Evidence Presented During Retrial*

On June 3, 2017, between 9:30 and 9:45 p.m., the California Highway Patrol responded to an accident at a highway intersection south of Lamont. When Officer Ahearn Lucas arrived, he saw a fluid trail, a vehicle bumper on the eastside of the road, and the deceased victim, David Rico, further on the right shoulder in a dirt area. South of the victim's body was a damaged utility pole. The "debris field" contained different parts

2.

of a vehicle. About one to two miles away, a vehicle, a Pontiac Aztek, was parked on the right shoulder of the roadway. Its rear license plate matched the license plate found on the bumper at the accident scene. The side-view mirror was missing and the front windshield and hood were damaged. The vehicle was leaking fluid and the fluid trail behind the vehicle led back to the scene of the accident and the victim, David Rico. Officer Cecil McKinty followed the fluid trail from the scene of the accident to the Aztek and noted that at points he lost a visual of the fluid trail. He testified that at certain points the fluid trail "goes into oncoming traffic and then back" and then it crosses the double yellow line.

When Officer McKinty approached the Aztek, the driver's side window was open, and he observed defendant in the driver's seat; he testified defendant appeared to be passed out with his head against the B pillar. McKinty shook defendant's shoulder a little to wake him. Defendant woke up and officers pulled him out of the car, guided him to the ground, and placed handcuffs on him. Defendant had a bloody nose and blood on his shirt. Defendant's eyes were red and watery, his speech was slurred, and he smelled like alcohol. He appeared to be walking unsteadily.

Based on these observations, the officers initiated a driving-under-the-influence (DUI) investigation. Officers Lucas and Daniel Dinsing administered field sobriety tests to help determine if defendant was under the influence of drugs or alcohol. The prosecution introduced a video of defendant performing the tests during his contact with law enforcement that night. Officer Lucas demonstrated each test to defendant and then defendant attempted to perform them. The tests included the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg stand test. When conducting the horizontal gaze nystagmus test, during which defendant was to track the officer's finger while the officer moved it in front of defendant's face, Lucas "observed a lack of smooth pursuit," and he had to tell defendant several times not to move his head. Defendant performed poorly on the walk-and-turn test; he walked off the line and appeared shaky and

3.

unsteady. And during the one-leg stand test, defendant put his foot down multiple times though he was instructed to hold it off the ground.

Officer Lucas conducted a preliminary alcohol screening (PAS) test on defendant using a handheld machine that defendant blew into to obtain a reading of his blood-alcohol content. The first breath sample was taken at 11:21 p.m. and reflected a blood-alcohol content of 0.24. The second sample was taken at 11:25 p.m. and reflected a blood-alcohol content of 0.25. Given the totality of the circumstances, including what Lucas observed at the crash scene, in contacting defendant, and defendant's performance on the field tests, Lucas determined defendant was under the influence. He took defendant for an evidentiary blood draw, which was done at 1:30 a.m. The blood test reflected a blood-alcohol concentration level of 0.251 percent.

A technical investigation was conducted on defendant's vehicle on June 6, 2016. Open and unopen beer cans were found in defendant's car, including an open can of Budweiser and five empty beer cans.[1] Reddish stains were detected on the pillar separating the front window and the passenger side door. A presumptive screening test

_____

[1]Investigator Matt Iturriria, who was an officer with the California Highway Patrol for 21 years before working at the Kern County District Attorney's Office, testified regarding his training and background in DUI investigations and his expertise on drugs and alcohol. The prosecutor posed Iturriria with the following hypothetical scenario mirroring the facts of the case: "[I]f a man in his mid 50's who is five feet five inches tall, 140 pounds, was involved in two crashes, the second of which happened a short distance and moments after the first, hit a pedestrian, both crashes were with objects, and the second one in the case a pedestrian who was off the roadway, that is to say out of the lanes of travel, and that same man in his mid 50's was contacted within an hour after these crashes, that man … blew a PAS test of a .24 and a .25 approximately two hours after those crashes, and then two hours after the PAS test had a blood draw which determined that he had .251 percent of a blood alcohol concentration; if you further consider for this hypothetical that that man had no drinking after the contact, which was about an hour after the two crashes, or at least within an hour after the two crashes, do you believe that in that hour between the crashes … and that first contact, that if that man drank five beers, one of which was a 25-ounce beer, … with the other facts …, would you expect them to have those blood alcohol concentration results?" Iturriria responded, "[T]here would be no way that someone could reach a .25 percent alcohol, which is very high, … consuming essentially six beers." He also opined that the person in the hypothetical scenario "would be too impaired to drive a motor vehicle and their alcohol impairment likely caused the traffic collision."

conducted on the stain tested positive for blood. The stain was submitted for DNA analysis. Defendant was excluded as a potential contributor to the DNA profile obtained from the pillar. David Rico could not be excluded as a possible contributor to the DNA extracted from the stain, and the pathologist testified the frequency of such a profile, meaning that to have someone have that same profile, was one in 6.9 octillion. The airbag in the car had deployed and defendant could not be excluded as a contributor to DNA collected from the airbag.

The pathologist who autopsied David Rico's body testified the cause of death was determined based on an external examination of the body. He explained there was evidence of a fracture at the base of Rico's skull, a lethal injury, including bleeding from the ears. The skin was scraped off the right side of the victim's head, a type of blunt force injury. There was bruising over Rico's right eyebrow with a laceration within the bruise, and a laceration on the back of his head.

At trial, the prosecution introduced certified records of three prior convictions defendant had suffered for driving under the influence of alcohol (Veh. Code, § 23152) and the attendant *Watson*[2] advisals that were given at the time of defendant's pleas to each of these charges. Investigator Iturriria explained, "A Watson advisal is something that law enforcement officers are … supposed to advise a DUI offender in regards to the dangers of driving under the influence, and that it is so dangerous that it could kill someone, and that that person could be charged with murder if they do, in fact, kill someone as a result of driving under the influence."

### Verdict and Sentence

A jury convicted defendant of second degree murder of David Rico (Pen. Code, § 187; count 1), gross vehicular manslaughter while intoxicated (*id.*, § 191.5, subd. (a); count 2) with enhancements for fleeing the scene (Veh. Code, § 20001, subd. (c)) and

---

[2] *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

5.

three prior Vehicle Code section 23152 convictions (Pen. Code, § 191.5, subd. (d)), hit and run resulting in death or permanent serious injury to David Rico (Veh. Code, § 20001, subd. (b)(2); count 3), and misdemeanor driving with a suspended or revoked license (*id.*, § 14601.2, subd. (a); count 4). The jury also found true circumstances in aggravation pursuant to California Rules of Court, rules 4.421(a)(1) (the offense involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness), 4.421(a)(3) (the victim was particularly vulnerable), 4.421(b)(1) (defendant engaged in violent conduct that indicates a serious danger to society) as to counts 1 and 3.

The court sentenced defendant on count 2 to 15 years to life enhanced by five years pursuant to Vehicle Code section 20001, subdivision (c). It also sentenced defendant on count 1 to 15 years to life and an upper term of four years on count 3, both sentences to be stayed pursuant to Penal Code section 654, until the successful completion of the sentence and permanently thereafter. On count 4, defendant was sentenced to the Kern County jail for a period of 180 days to be served concurrent with his sentence on count 2.

## DISCUSSION

On appeal, defendant challenges his murder conviction (count 1), asserting insufficient evidence supports the jury's finding of implied malice. We disagree and affirm the judgment.

### Standard of Review—Sufficiency of the Evidence

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence is "'"""whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"""" (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) The reviewing court's task is to review the entire record in the light most favorable to the

6.

judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (See *People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Powell* (2018) 5 Cal.5th 921, 944.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence."'" (*People v. Navarro*, *supra*, at p. 302.)

It is the jury, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11.) If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*Ibid*.)

**Applicable Law**

"Murder" is defined as the unlawful killing of a human being, or a fetus, with malice aforethought. (§ 187, subd. (a).) "For purposes of Section 187, malice may be express or implied." (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id*., subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id*., subd. (a)(2).) "As a general rule, malice is implied when the defendant deliberately performs an act, knowing that their conduct endangers the life of another, and acts with conscious disregard for life." (*People v. Collins* (2025) 17 Cal.5th 293, 310.) That is, "[m]urder is committed with implied malice when 'the killing is proximately caused by "'an act, the

natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*Id.* at p. 321.)

In *Watson*, *supra*, 30 Cal.3d 290, the California Supreme Court held that an automobile collision resulting in death could result in prosecution for second degree murder and for vehicular manslaughter. (*Id*. at pp. 294–295.) The *Watson* court explained, a finding of implied malice "depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Id.* at pp. 296–297.) *Watson* further held the evidence in that case was sufficiently wanton to support a probable cause finding of implied malice to sustain an indictment charging the defendant with second degree murder. (*Id*. at pp. 293–295, 300–301.) This included evidence the defendant had consumed enough alcohol to support a finding he was legally intoxicated; he was aware of the hazards of driving while intoxicated; and, while intoxicated, defendant drove at highly excessive speeds through city streets and nearly collided with another vehicle after running a red light, and thereafter the defendant resumed his excessive speed and collided with another vehicle, causing the death of a driver and her six-year-old daughter. (*Ibid*.)

**Analysis**

Defendant contends insufficient evidence supports the jury's conclusion he committed second degree implied malice murder. He asserts the facts in *Watson*, *supra*, 30 Cal.3d 290 are distinguishable. Specifically, he argues the facts in the current case do not exhibit endangering conduct or subjective awareness. Rather, he contends, there was no showing he drove at high rates of speed through city streets prior to the incident or that he ran a red light. We conclude substantial evidence supports defendant's murder conviction and, relatedly, the jury's finding of implied malice.

8.

Initially, as discussed, it is settled that "malice may be implied when a person drives a motor vehicle under the influence of alcohol and kills someone." (*People v. Lagunas* (2023) 97 Cal.App.5th 996, 1005; see *Watson*, *supra*, 30 Cal.3d at pp. 293–294.) Indeed, "[s]ince *Watson*, numerous cases have upheld drunk driving murder convictions." (*People v. Autry* (1995) 37 Cal.App.4th 351, 358; *People v. Lagunas*, *supra*, at p. 1005 ["Following *Watson*, published opinions have—without exception— found sufficient evidence to uphold murder convictions when defendants kill people while driving under the influence of alcohol"].) "[T]hese cases have relied on some or all of the following factors in upholding such convictions: (1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*People v. Autry*, *supra*, at p. 358; see *People v. Lagunas*, *supra*, at p. 1005.)

"[A]ll four factors are present here." (*People v. Autry*, *supra*, 37 Cal.App.4th at p. 358; see *People v. Talamantes* (1992) 11 Cal.App.4th 968, 973.) Defendant's breath samples during the preliminary alcohol screening test following the accident reflected a blood-alcohol content of 0.24 percent at 11:21 p.m. and a blood-alcohol content of 0.25 percent at 11:25 p.m. His evidentiary blood test reflected a blood-alcohol concentration level of 0.251 percent at 1:30 a.m. The jury could reasonably infer from such evidence, coupled with testimony that defendant was visibly intoxicated, that defendant was driving with a blood-alcohol level of over three times the legal limit of 0.08 percent. There was also evidence from which the jury could conclude defendant had taken alcohol in the car with him and had been drinking in the car, given the empty and open beer cans in his car. Thus, the jury could reasonably infer defendant had "'a predrinking intent to drive'" after consuming alcohol. (See *People v. Lagunas*, *supra*, 97 Cal.App.5th at pp. 1005–1006; see *People v. Autry*, *supra*, 37 Cal.App.4th at p. 358.) Furthermore, defendant had multiple prior convictions for driving under the influence of alcohol in which "he was explicitly warned that he could be convicted of murder if he continued to do so";

9.

therefore, there was evidence he "had knowledge of the hazards of driving while intoxicated." (*People v. Lagunas*, *supra*, at p. 1006; see *People v. Autry*, *supra*, at p. 359 ["The jury could reasonably infer that [defendant's four prior convictions of drunk driving] alone … impressed upon appellant the dangers of drunk driving"].) Finally, there was substantial evidence from which the jury could conclude defendant engaged in highly dangerous driving. Specifically, the jury could reasonably have concluded defendant hit a utility pole, severely damaging his car; then he continued to drive onto the shoulder and dirt where he hit the victim; at some point defendant's airbag deployed; and then defendant continued to drive for another one to two miles, crossing lanes into oncoming traffic, before eventually stopping on the side of the road.

Defendant's attempts to distinguish *Watson*, by arguing there was no evidence here that he was speeding or ran a red light, are unpersuasive. As discussed, even if the specific facts differ from those in *Watson*, the evidence presented in this case supports the jury's finding of implied malice. Defendant also contends his prior incidents of drunk driving for which he suffered convictions do not support a finding of actual knowledge or appreciation of the hazards associated with drunk driving because those incidents did not result in vehicle damage or injury. Again, we disagree. Rather, evidence of defendant's prior convictions supports a finding that defendant appreciated the dangers of driving while intoxicated. (See *People v. Ortiz* (2003) 109 Cal.App.4th 104, 112 ["courts have recognized repeatedly that a motor vehicle driver's previous encounters with the consequences of recklessness on the highway—whether provoked by the use of alcohol, of another intoxicant, by rage, or some other motivator—sensitizes him to the dangerousness of such life-threatening conduct"].) Furthermore, here there was evidence defendant was given a *Watson* advisal during all three of the prior conviction proceedings, specifically advising him that "being under the influence of alcohol or drugs or both impairs your ability to safely operate a motor vehicle; therefore, it is extremely dangerous to human life to drive under the influence of alcohol or drugs or both. If you

10.

continue to drive while under the influence of alcohol or drugs or both and as a result of that driving, someone is killed, you can be charged with murder."  (Veh. Code, § 23593.) Thus, there was evidence he was expressly put on notice on three different prior occasions that driving under the influence of alcohol is extremely dangerous and could result in someone being killed.  In addition, the evidence introduced at trial supported a conclusion defendant first hit a utility pole, losing his bumper and side mirror, before continuing to drive under the influence and hitting and killing the victim on the shoulder of the road.  Thus, the initial collision with the utility pole also put him on notice of the dangers of driving while intoxicated and the potential for significant additional harm, yet he continued to drive.

Viewing the evidence in the light most favorable to the verdict, we conclude sufficient evidence supports the jury's conclusion defendant acted deliberately with conscious disregard for human life (implied malice).  (See *Watson*, *supra*, 30 Cal.3d at pp. 300–301 ["'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit conscious disregard of the safety of others'"].)

Notably, defendant also contends the finding in his prior appeal in this matter that he did not understand his right to request attorney assistance affected his retrial.  He argues, "while [he] may have signed the *Watson* advisal acknowledgements, the absence of an attorney to assist him, resulting in large measure from insufficient *Miranda* advisements, as well as his inability to understand technical English, and a likely misunderstanding as to the purpose of his signatures, failed to establish his understanding of the warnings contained in the *Watson* advisals."  As the People note, contrary to defendant's argument, nothing in the record suggests defendant did not understand the *Watson* advisals.  And the probative value, or weight, to be given such evidence was an issue for the jury to decide.  (*People v. Turner* (2020) 10 Cal.5th 786, 806.)  It is well-

settled that "'[a] reviewing court neither reweighs [the] evidence nor reevaluates a witness's credibility.'"  (*People v. Thomas* (2023) 14 Cal.5th 327, 378.)

For all these reasons, we reject defendant's contentions.

## DISPOSITION

The judgment is affirmed.

PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.